# In the Iowa Supreme Court

No. 23–0970

Submitted September 12, 2024—Filed November 15, 2024
Amended November 21, 2024

**In the Interest of N.S.**

**N.S.,**

Appellant.

Appeal from the Iowa District Court for Pottawattamie County, Margaret Reyes, judge.

N.S. appeals the denial of his petition for restoration of firearm rights under Iowa Code section 724.31. **Affirmed.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., joined, and in which McDonald and Oxley, JJ., joined as to parts I, II, III.A, and IV. McDonald, J., filed an opinion concurring in part and concurring in the judgment, in which Oxley, J., joined. McDermott, J., filed a dissenting opinion, in which Mansfield and May, JJ., joined.

Eric S. Mail (argued), and Eric D. Puryear of Puryear Law P.C., Davenport, for appellant.

Brenna Bird, Attorney General; Patrick Valencia (argued), Deputy Solicitor General; and Sarah A. Jennings, Assistant Attorney General, for appellee.

**Waterman, Justice.**

This appeal presents our first opportunity to address article I, section 1A of the Iowa Constitution (or "Amendment 1A"), which went into effect after its ratification by Iowa voters on November 8, 2022. It provides:

> The right of the people to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all restrictions of this right shall be subject to strict scrutiny.

Iowa Const. art. I, § 1A. We must decide whether Iowa's statutory procedure for the restoration of firearm rights lost due to an involuntary commitment for mental health treatment survives a strict-scrutiny constitutional challenge under Amendment 1A.

The petitioner, N.S., was involuntarily committed at age sixteen in 2006. The committal disqualified him from possessing firearms under federal law. *See* 18 U.S.C. § 922(g)(4) (2006). In August 2022, he filed a petition under Iowa Code section 724.31 (2022) for restoration of his firearm rights. The State and the county attorney opposed his petition. In April 2023, the district court conducted an evidentiary hearing and denied his petition after finding that N.S. failed to prove he "will not be likely to act in a manner dangerous to the public safety." The district court rejected N.S.'s state constitutional challenge,[1] ruling that "Amendment 1A does not apply retrospectively to [his] disqualification which occurred in 2006" and that section 724.31 survives strict scrutiny. We retained N.S.'s appeal.

On our de novo review, we agree with the district court's factual findings and determination that N.S. failed to meet his burden to satisfy the statutory criteria for restoration of his right to possess firearms. We hold that

---

[1]N.S. makes no claim under the Second Amendment to the United States Constitution.

Amendment 1A applies prospectively to N.S.'s restoration proceeding in 2023. We further hold that section 724.31 survives strict scrutiny under Amendment 1A. The State has a compelling interest in preventing gun violence and suicide. Section 724.31 is narrowly tailored to serve that interest by keeping firearms from dangerous persons while allowing restoration of firearm rights upon a petitioner's showing they are no longer a threat to public safety. We decline to shift the burden of proof under section 724.31 from the petitioner to the State. For the reasons more fully explained below, we affirm the district court judgment.

### I. Background Facts and Proceedings.

On November 13, 2006, when N.S. was sixteen years old, his mother and father simultaneously filed two applications in Pottawattamie County to involuntarily commit him on the grounds of his serious mental impairment under Iowa Code section 229.6 and his chronic substance abuse under Iowa Code section 125.75. The accompanying parental affidavits reported that N.S. had made statements threatening to harm himself and others. Specifically, N.S. had "threatened to take the life of his family—then his own." The applications described his prior diagnoses of bipolar disorder, attention deficit hyperactivity disorder (ADHD), and oppositional defiant disorder (ODD). His parents attested that N.S. refused to attend therapy and refused to take his prescribed medication and instead had been self-medicating with alcohol and illegal drugs for "the past two years." N.S.'s father took him to the hospital after N.S. drank over a quart of vodka. There, N.S. admitted drinking one-half gallon of vodka from midnight to 5:30 a.m. before his hospitalization. The juvenile court found, by clear and convincing evidence, that N.S. was "seriously mentally impaired" under Iowa Code section 229.14 and "likely to injure himself if allowed to remain at liberty."

The court ordered N.S. to be detained at Jennie Edmundson Hospital in Council Bluffs for evaluation. N.S. was represented by counsel in the chapter 229 proceedings.

Dr. James Severa, the evaluating psychiatrist, diagnosed N.S. with "bipolar disorder, depressed type, polysubstance abuse with preference to alcohol and THC, i.e. marijuana, oppositional defiant characteristics." N.S. was also found to be a substance abuser in need of treatment. Dr. Severa reported that N.S. "needs ongoing psychiatric care, ongoing psychological counseling, and he is to stay on his medications as appropriate at the time as prescribed by a psychiatrist." N.S. was ordered to inpatient treatment for both his mental illness and substance abuse. The court cases were dismissed on January 30, 2007, when N.S. was deemed "compliant with services with outpatient treatment."

A year later, on January 31, 2008, N.S.'s aunt and maternal grandfather petitioned for his committal, alleging his serious mental impairment and that he was a threat to himself or others. Their affidavits described N.S. as struggling with anger issues, paranoia, and suicidal ideation. They disclosed N.S. threatened to kill his mother several times and stated, "I get so mad I could just hurt someone." N.S. was also damaging property, breaking windows, punching holes in walls, and threatening to burn down the house with its occupants inside. The court ordered N.S. to be held for evaluation at Alegent Health Mercy Hospital in Council Bluffs. Dr. Narendra Reddy issued a psychiatric intake report after his committal. Dr. Reddy concluded that N.S. was experiencing behavioral issues rather than mental illness and could be evaluated on an outpatient basis. Based on that report, the court dismissed the case on February 4, 2008.

Fourteen years later, in March of 2022, when N.S. was thirty-one years old, the Pottawattamie County Sheriff denied his application for a weapons

permit. N.S., represented by counsel, sought a mental health examination to support a petition for restoration of his firearm rights under Iowa Code section 724.31. This resulted in the only other mental health assessment in the record. On April 25, N.S. was evaluated by Maureen Gatere, a psychiatric nurse practitioner at All-Care Heath Center in Council Bluffs. N.S. told Gatere, "[T]here is nothing wrong with me. I am completely fine. The only thing that brings me here today is for a concealed carry permit evaluation so I can be a gun owner." Gatere reported he "denies any history of mental or psychiatric illness." N.S. told her he was committed twice as a child by his mom and his aunt from Texas but that it was for "no reason" and that his "mom was always off" and "is a hoarder." He told Gatere that his mom was addicted to pain pills and Xanax. He explained to her that his "mom thought he had bipolar disorder" and that he took Adderall for some time but "could not sleep at all and that stuff [was] not for [him]." He said he "got in trouble a lot as [a] kid due to being bullied for being overweight." He acknowledged some depression. He denied "any history of suicidal or homicidal ideations." He denied "any history of excessive anxiety and worry" or "any physical or psychological symptoms associated with situational anxiety." N.S. told Gatere that in 2010, people broke into his house and "beat [his] head in" and that "[b]ecause of that, [he is] paranoid about home defense." He mentioned some "health records that stated he has a history of a TBI [(traumatic brain injury)], seizures secondary to the TBI, and alcohol use disorder." He "wanted those diagnoses to be removed from his record as they were not accurate." He told her he "would really like to join the army" but "his seizure diagnosis has worked against him." He said his recruiter "wanted [him] to lie" and that he "regret[s] not being able to join the army." Gatere described N.S. as nervous and preoccupied about what her visit note would say about him.

Two days later, N.S. returned "to share some information that he did not share at his last visit two days ago." He told Gatere, "[Y]ou . . . seem like a rational, well-put[-]together person so I will be honest with you." He then disclosed, "After my concussion I was diagnosed with anxiety. I was prescribed 0.5mg of Xanax to take three times a day." That dosage was increased, and at times, he'd run out, resulting in withdrawal symptoms and multiple emergency room visits. He was given "2 weeks of valium to taper off." He admitted he did not share that information on his first visit "because I have so much riding on this" and stated, "What they did to me was wrong (prescribing Xanax). They tried to kill me. Not physically but you know what I mean." They also prescribed Depakote and other medications for his 2010 seizure that made him feel "like a zombie," so he stopped taking them.

Gatere checked the Iowa Prescription Monitoring Program records and learned that N.S. had filled a prescription for a benzodiazepine (Oxazepam) from a provider in Omaha just three months earlier on January 22, 2022, as well as oxycodone in late 2021 and testosterone cypionate in 2020 and 2021, both prescribed by another provider in Houston. She noted that N.S. never disclosed those medications to her. Her report noted that N.S. "is not interested in medication management" and that "[h]is purpose for this evaluation is to obtain an IA concealed carry license." The report stated, "[N.S.] was advised that this provider does not evaluate for fitness to hold any license, but that he and his attorney are welcome to request these records[.] No follow up needed." Under the heading "Risk of Harm Assessment," the "Level of risk" was noted as "None - no ideation to harm self or others."

On August 24, N.S. filed this action for restoration of his firearm rights. On November 8, Iowa voters ratified Amendment 1A, which went into effect on

December 1. The district court subsequently conducted an evidentiary hearing on March 16, 2023. N.S. was the only witness to testify. He submitted Gatere's report. He also submitted criminal history record checks showing he had no criminal history as an adult apart from an operating while intoxicated charge at age eighteen that was dismissed after he completed a diversion program, five negative drug screen results (which did not test for alcohol or benzodiazepines), and a calendar showing dates he volunteered at the Open-Door Mission in March when he was laid off from work. Over the State's objection, N.S. offered five unsworn statements from character witnesses, which the court received subject to the objection. The letters were from his wife, three family friends, and his supervisor. The court, at N.S.'s request and without objection, took judicial notice of N.S.'s court files for his mental health and substance abuse commitments in 2006 and 2008.

N.S. testified that he did not learn until his 2022 permit denial that he had lost his firearm rights because of his 2006 civil commitment. While living in Nebraska, he obtained a firearm permit and owned and used firearms at a shooting range for several years. He turned his weapons over to a family member after his Iowa permit was denied. Meanwhile, N.S. had earned his GED, a CNA certificate, and was two credits away from an agricultural business degree. He is married and has two young children with his wife, including a son with special needs. The Gatere report notes N.S. fathered another child, now age ten, that he never mentioned in his testimony at the restoration hearing. N.S. has a commercial driver's license and has maintained steady employment for the last six years as a mover and van driver at Select Van and Storage.

On his direct examination, he blamed his juvenile commitments on trouble getting along with his mother. On cross-examination, he denied threatening his

mother, himself, or anyone else and denied that he was a danger to himself or others when he was committed in 2006. He insisted he was committed only because he and his "mom butted heads," he "was a little bit of a troubled teenager, very difficult to raise up," he "would stay out kind of late" skateboarding, and he "didn't really want to follow a lot of rules." Despite the 2006 diagnoses, N.S. denied any history of mental or psychiatric illness or substance abuse, although he admitted the amount he drank as a juvenile "was extremely unhealthy." He testified he has not participated in any therapy since his court-ordered therapy ended in 2008. He admitted to suffering multiple concussions over his lifetime without providing any medical evidence regarding their timing or treatment. He initially denied taking any medication like Xanax after his problems with it in 2010 but admitted on cross-examination to taking medication for stress as recently as January 2022. He disputed much of the information in the Gatere evaluation report without providing any other records to support his assertions.

In the unsworn letters supporting his petition, his supervisor described N.S. as "one of our best employees" and "a man of good moral character." His wife described him as "a constant protector and provider" for the family and not "unsafe or unstable in any way." A friend, a retired Deputy Cass County Attorney, called N.S. "a fine citizen and devoted family man." Another family friend wrote that N.S. is a "healthy, mentally stable individual." Missing from the record is any letter or other indication of support from N.S.'s mother, father, aunt, or grandparent—the family members who twice had him involuntarily committed.

The State and county attorney opposed restoration of his gun rights. N.S.'s attorney, without raising the Second Amendment, argued that the new Amendment 1A to the Iowa Constitution shifted the burden of proof to the State:

> I would note in Iowa we had a recent constitutional amendment passed. There's no case law [on] what that amendment means for these sort of hearings, but under Iowa law, the right to keep and bear arms is a fundamental right subject to strict scrutiny, and so if we look at the strict scrutiny standard, just taking the plain language of the amendment that applies to our Constitution now, it certainly applies to everything that happened for the State to include this hearing. We need strict scrutiny to deny someone that right. *Although the code as written provides that [N.S.] has the burden of demonstrating why it is that he should have his gun rights restored, I would actually respectfully argue that that constitutional amendment means the burden is now on the State to prove by strict scrutiny that there is, in fact, a reason to deny him that right.*

(Emphasis added.)

The district court issued a thorough thirteen-page ruling denying N.S.'s petition. The court did not accept N.S.'s invitation to shift the burden of proof to the State. The court pointed out conflicts between N.S.'s testimony, the committal records, and the Gatere report. The court noted, "Because [N.S.] denies any history of mental illness or substance abuse, he failed to testify about any insight he gained from treatment or therapy as a juvenile." The court faulted N.S. for providing little information about his treatment for multiple concussions, for withholding information from Gatere in his initial interview, and for failing to mention in his direct testimony his prescription medications for anxiety as recently as 2020 to 2022 after testifying he took nothing like Xanax after 2010. The court concluded:

> Based upon this record, the court fears that [N.S.] lacks insight into his mental health and/or substance abuse issues. Without additional information, the court lacks sufficient information to assess [N.S.'s] mental health and determine[] whether [N.S.] is likely to act dangerously in the future. While [N.S.] has no criminal history,

> he provided little *independent* evidence concerning his character or reputation in the community. [N.S.] provided no family or professional witnesses to testify to the positive changes he's made in his life over the past fifteen years. [N.S.'s] character letters are predictably one-sided and most provide only a snapshot of [N.S.'s] life over the past few years. When considering all of the factors set out in Iowa Code § [724.31(3)], and the quality of the evidence provided by [N.S.], the court is unable to determine whether [N.S.] "will not be likely to act in a manner dangerous to the public safety" under Iowa Code § 724.31.

The court noted that section 724.31 allows N.S. to reapply for restoration in two years.

N.S. filed a motion to reconsider under Iowa Rule of Civil Procedure 1.904(2), seeking a ruling addressing his constitutional challenge under Amendment 1A. The State resisted, arguing that Amendment 1A did not apply retroactively to the 2006 firearm disqualification and that section 724.31 survived strict scrutiny. The district court rejected the constitutional challenge. The court agreed with the State that Amendment 1A did not apply retroactively to N.S.'s 2006 committal. The court recognized the State's compelling interest in keeping firearms from the mentally ill and upheld section 724.31 because it is "narrowly tailored to restrict only those individuals likely to act in a manner dangerous to . . . themselves or others from possessing a firearm and it provides an avenue to restore their firearm rights when the individual is no longer a danger."

N.S. appealed, arguing that he satisfied the statutory criteria for restoration of his firearm rights and that Amendment 1A required restoration on this record. Specifically, N.S. argues that Amendment 1A requires shifting the burden of proof under section 724.31 to the State. The State responded that the district court correctly applied the statutory criteria and correctly rejected the constitutional challenge. We retained the case.

**II. Standard of Review.**

We review de novo the district court's ruling denying a petition to restore rights to possess firearms. Iowa Code § 724.31(4). "Under a de novo review, 'we make an independent evaluation of the totality of the circumstances as shown by the entire record.' " *In re A.M.*, 908 N.W.2d 280, 283 (Iowa Ct. App. 2018) (quoting *State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993)). "But because the district court had the opportunity to observe the witnesses and evaluate their credibility firsthand, we give deference to its factual findings." *Id.*

"We review constitutional claims de novo." *Mitchell County v. Zimmerman*, 810 N.W.2d 1, 6 (Iowa 2012). It is the government's burden to show the challenged statute "serves a compelling state interest and is the least restrictive means of attaining that interest." *Id.*; *see also AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 41 (Iowa 2019) ("Under strict scrutiny, 'the statute will survive a constitutional challenge only if it is shown that the statute is narrowly drawn to serve a compelling state interest.' " (quoting *City of Maquoketa v. Russell*, 484 N.W.2d 179, 184 (Iowa 1992) (en banc))). "[I]f a statute is susceptible to more than one construction, one of which is constitutional and the other not, we are obliged to adopt the construction which will uphold it." *Santi v. Santi*, 633 N.W.2d 312, 316 (Iowa 2001).

**III. Analysis.**

We first address N.S.'s challenge to the district court's statutory ruling. Giving deference to the district court's assessment of N.S.'s credibility, we affirm its ruling denying his petition for restoration of his firearm rights. Then, we address N.S.'s challenge to the constitutionality of Iowa Code section 724.31. We conclude this statute survives strict scrutiny under Amendment 1A.

**A. Whether N.S. Made the Statutory Showing Required for Restoration of His Firearm Rights Under Iowa Code § 724.31.** We have not previously reviewed appeals under Iowa Code section 724.31. The only published Iowa appellate decision on this statute is *In re A.M.*, 908 N.W.2d 280, which helpfully explains the genesis of the restoration statute.

As noted, federal law prohibits N.S. from possessing firearms due to his involuntary commitment to a mental institution. *See* 18 U.S.C. § 922(g)(4) (providing that it is "unlawful for any person . . . who has been committed to a mental institution" to possess "any firearm or ammunition"). "Congress enacted this prohibition as part of the Gun Control Act of 1968." *In re A.M.*, 908 N.W.2d at 283. In 2008, in response to the Virginia Tech shooting, Congress enacted legislation to improve recordkeeping at the National Instant Criminal Background Check System (NCIS) that identifies persons like N.S. prohibited from possessing firearms. *See id.* at 284. Congress authorized federal grants to states to fund better reporting to the NCIS; the grants were conditioned on the enactment of state legislation allowing restoration of firearm rights. *Id.* The federal enactment required the state legislation to "instruct reviewing courts to consider the applicant's record and reputation when making two determinations: (1) the person 'will not be likely to act in a manner dangerous to public safety' and (2) 'the granting of relief would not be contrary to the public interest.' " *Id.* (quoting *Franklin v. Lynch*, No. 3:16–cv–36, 2016 WL 6879265, at *3, *6 (W.D. Pa. Nov. 21, 2016)). In 2011, the Iowa legislature responded by enacting Iowa Code section 724.31 to meet the federal grant requirements. *Id.*; *see also United States v. Johnson*, No. CR15–3035–MWB, 2016 WL 212366, *5 (N.D. Iowa Jan. 19, 2016).

Iowa Code section 724.31 provides in relevant part:

2. A person who is subject to the disabilities imposed by 18 U.S.C. § 922(d)(4) and (g)(4) because of an order or judgment that occurred under the laws of this state may petition the court that issued the order or judgment or the court in the county where the person resides for relief from the disabilities imposed under 18 U.S.C. § 922(d)(4) and (g)(4). A copy of the petition shall also be served on the director of health and human services and the county attorney at the county attorney's office of the county in which the original order occurred, and the director or the county attorney may appear, support, object to, and present evidence relevant to the relief sought by the petitioner.

3. The court shall receive and consider evidence in a closed proceeding, including evidence offered by the petitioner, concerning all of the following:

*a.* The circumstances surrounding the original issuance of the order or judgment that resulted in the firearm disabilities imposed by 18 U.S.C. § 922(d)(4) and (g)(4).

*b.* The petitioner's record, which shall include, at a minimum, the petitioner's mental health records and criminal history records, if any.

*c.* The petitioner's reputation, developed, at a minimum, through character witness statements, testimony, and other character evidence.

*d.* Any changes in the petitioner's condition or circumstances since the issuance of the original order or judgment that are relevant to the relief sought.

4. The court shall grant a petition for relief filed pursuant to subsection 2 if the court finds by a preponderance of the evidence *that the petitioner will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest.* A record shall be kept of the proceedings, but the record shall remain confidential and shall be disclosed only to a court in the event of an appeal. The petitioner may appeal a denial of the requested relief, and review on appeal shall be de novo. A person may file a petition for relief under subsection 2 not more than once every two years.

5. If a court issues an order granting a petition for relief filed pursuant to subsection 2, the clerk of the court shall immediately

notify the department of public safety of the order granting relief under this section. The department of public safety shall, as soon thereafter as is practicable but not later than ten business days thereafter, update, correct, modify, or remove the petitioner's record in any database that the department of public safety makes available to the national instant criminal background check system and shall notify the United States department of justice that the basis for such record being made available no longer applies.

(Emphasis added.) Subsection 4 adopts verbatim the language required by Congress for federal funding. *In re A.M.*, 908 N.W.2d at 284 n.4 ("Congress conditioned federal funding on the inclusion of this language and our legislature simply adopted it."). The court of appeals viewed the public safety prong as "akin to Iowa's danger-to-self-or-others standard for serious mental impairment." *Id.*; *see also In re J.P.*, 574 N.W.2d 340, 342–43 (Iowa 1998) (discussing the danger-to-self-or-others standard for serious mental impairment). We agree with that equivalence.

N.S., as the petitioner, bears the burden of proof to show by a preponderance of the evidence that he "will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." Iowa Code § 724.31(4); *see* Iowa R. App. P. 6.904(3)(*e*) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established."); *In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018) (applying rule 6.904(3)(*e*)); *Vance v. Iowa Dist. Ct.*, 907 N.W.2d 473, 481 (Iowa 2018) ("Nothing in the language of Iowa Code section 664A.8 explicitly places the burden of proof on the defendant. Yet, the language of the statute implies this by requiring the court to extend the no-contact order 'unless the court finds that the defendant no longer poses a threat' to the protected parties."); *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51, 56–58 (2005) (applying the "ordinary default rule" that when the

statute "is silent . . . as to which party bears the burden of persuasion[,] . . . [w]e hold that the burden lies, as it typically does, on the party seeking relief"). It makes sense to place the burden of proof on petitioners, who best know their own course of treatment and progress since their mental health commitment. Therefore, we hold that the statutory framework of section 724.31 as written places the burden on the petitioner.

Section 724.31(3) directs us to consider on our de novo review "(1) the circumstances of the incident[s] resulting in [N.S.'s] loss of firearm privileges; (2) [N.S.]'s mental health and criminal history records; (3) his reputation, developed, at a minimum, through character witness statements or testimony; and (4) any changes in [N.S.]'s condition or circumstances since his involuntary hospitalization relevant to restoring his firearm privileges." *In re A.M.*, 908 N.W.2d at 284; *see* Iowa Code § 724.31(3). The court of appeals appropriately gave "due deference to the trial court's ability to see and hear A.M. and his character witnesses." *In re A.M.*, 908 N.W.2d at 287. We likewise give deference to the district court's assessment of N.S.'s live testimony and reach the same conclusion that he failed to satisfy his burden of proof.

Both N.S. and the State rely on *In re A.M.*, 908 N.W.2d 280. In that case, the petitioner, A.M., lost his firearm rights in 2010 at age twenty. *Id.* at 281–82. A.M. was abusing alcohol and had suffered from depression since high school but refused to take prescribed medication. *Id.* at 281. After drinking many beers, A.M. sideswiped a bridge while driving his brother's truck. *Id.* & n.1. Distraught, he "decided to commit suicide with his mother's shotgun," and in the ensuing struggle over that weapon, he assaulted his mother, thirteen-year-old sister, and a neighbor, inflicting injuries on all three requiring medical attention. *Id.* at 281–82. His mother initiated the civil commitment proceedings leading to his

involuntary hospitalization under Iowa Code chapter 229. *Id.* at 282. A.M. was discharged for outpatient treatment. *Id.* He completed court-ordered substance abuse treatment and took his prescribed medication for depression for several months but then stopped without consulting a doctor. *Id.* He abstained from drinking alcohol for a few years but then resumed drinking occasionally. *Id.* He got married in 2013, had a son in 2015, and opened his own painting business. *Id.* Six years after his civil commitment, A.M. petitioned for restoration of his firearm rights. *Id.*

The district court conducted an evidentiary hearing in 2016. *Id.* at 282–83. A.M. submitted his mental health records from 2010 and a criminal history showing only speeding tickets since 2010. *Id.* at 283. He testified, as did his mother and a deputy who was a family friend. *Id.* An assistant attorney general representing the state and the county attorney participated in the hearing and cross-examined the witnesses. *Id.* The county attorney subsequently filed a statement supporting A.M.'s petition, and the state did not join or oppose that statement. *Id.* The district court "denied A.M.'s petition[,] reasoning 'too little time' had passed since A.M.'s commitment and noting A.M.'s 'only long-term change' is that he no longer drinks alcohol in excess." *Id.* The court of appeals, stating this "case presents a close call," affirmed on its de novo review, determining, like the district court, that "A.M.'s evidence fell short of showing he will not be likely to act in a manner dangerous to the public safety." *Id.* at 287.

N.S. argues that if *In re A.M.* was a "close call," he surely met his burden. N.S. was not committed for attempting to misuse a weapon or for physically injuring others, *see id.* at 281–82; by contrast, A.M. threatened suicide with a shotgun and injured his mother, sister, and neighbor in the struggle for the weapon. N.S. contrasts his sixteen-year history of law-abiding behavior with

A.M.'s six years. *See id.* at 285. N.S. provided a recent mental health assessment, which A.M. lacked. *See id.* at 285–86. N.S. provided five supporting statements, including one from his employment supervisor, while neither of A.M.'s witnesses was disinterested. *See id.* at 286. And N.S. argues that he has a proven track record of safe firearm ownership and use—a showing not made by A.M.

The State responds by noting that N.S. had threatened to harm himself and his family. His mental health assessment in 2022 raised more questions than it answered. None of N.S.'s character witnesses testified or provided sworn statements, and only one was disinterested. Notably, N.S.'s parents—who committed him in 2006—offered no statements supporting restoration of his firearm rights in 2023, nor did his aunt or grandfather—who sought his commitment in 2008. By contrast, A.M.'s mother, who six years earlier committed him after he assaulted her, testified in person and "offered a glowing statement of his progress." *Id.* The county attorney supported A.M.'s petition, *see id.* at 287, while both the county attorney and the State object to N.S.'s petition. The State notes that the respective district courts found N.S. and A.M. each failed to acknowledge their mental health and substance abuse issues. *See id.* Finally, while the court found that "A.M. has weathered [his] life stressors without any tumult," *see id.*, the State notes that, by contrast, N.S. was prescribed Xanax for anxiety in 2010 "that spiraled into a dangerous addiction, complete with trips to the emergency room, withdrawals, and a tapering protocol with Valium," and later resumed taking prescription medications for anxiety. We agree with the State that *In re A.M.* does not support reversal here. Each case turns on its evidentiary record.

Iowa Code section 724.31(3)(*a*) directs us to consider the circumstances that led to his firearm prohibition. On our de novo review, we disbelieve N.S.'s

testimony downplaying his teenage behavior, and we find persuasive his parents' affidavits and the 2006 medical evaluation. Based on that evidence, we find that N.S. at that time was a threat to himself and others, threatened to kill his parents, was suicidal, repeatedly damaged property, drank dangerous amounts of alcohol, abused prescription medications and illegal drugs, was noncompliant with treatment, and suffered from bipolar disorder and substance abuse disorder.

Iowa Code section 724.31(3)(*b*) next directs us to consider N.S.'s mental health and criminal records. His 2006 hospital records show dangerous behavior and mental health problems. After completing brief court-ordered therapy in 2008, he did nothing thereafter to treat his bipolar disorder, which may persist untreated to this day. N.S. failed to provide records for his multiple concussions and seizures. The only mental health record he offered was the Gatere report in 2022, which was based on the incomplete history he self-reported and raises more questions than it answers. He failed to tell Gatere in his initial interview that he was addicted to Xanax in 2010 because he wanted her to support restoration of his firearm rights. Her own check of the prescription database revealed that N.S. filled multiple prescriptions for antianxiety medications in 2020, 2021, and 2022 that he never disclosed to her. We find N.S. is willing to mislead by omission to get what he wants: a license to carry. And his denials of any mental health problems are belied by the 2006 medical evaluation. N.S. provided no clean bill of current mental health.

N.S. argues that "he has already demonstrated through his years of safe ownership that he can be trusted with firearms." He notes that Nebraska granted his license to carry and that he owned and used firearms until he was made aware of the federal firearm prohibition when his Iowa permit application was

denied in March 2022. The district court did not rely on his admitted firearm use in ruling on his restoration petition. We decline to credit N.S. for the years he owned and used firearms illegally. We would create a perverse incentive for petitioners to possess and use firearms illegally if doing so could support restoring their firearm rights. N.S. cites no authority holding that the petitioner's illegal possession and use of firearms can be considered to support judicial restoration of firearm rights. We will not be the first court to embrace that proposition. To the contrary, his conduct—illegally possessing and using firearms—cuts against his petition for restoration.

Iowa Code section 724.31(3)(*c*) directs us to consider N.S.'s reputation. Like the district court, we give little weight to the unsworn statements from his wife and friends. We note that the State and the county attorney oppose his petition. Importantly, neither parent supports restoration of his firearm rights, nor does his grandfather or aunt. The only arguably disinterested person supporting N.S. is his supervisor at the moving company.

Finally, Iowa Code section 724.31(3)(*d*) directs us to consider any changes in N.S.'s circumstances since his 2006 mental health commitment. We credit N.S. for gainful employment for over six years, his GED and college credits, his marriage with young children, and his lack of any criminal record after age eighteen. Yet he failed to explain his treatment or lack thereof for his concussions, seizures, anxiety, or bipolar disorder in the intervening years since his involuntary hospitalizations. As the Gatere evaluation shows, N.S. withheld information he thought would imperil his petition. The district court, which heard his live testimony, found that he failed to show "he will not be likely to act in a manner dangerous to public safety." With due deference to the district

court's assessment of his credibility, we agree with that finding and affirm the district court's denial of N.S.'s restoration petition.

**B. N.S.'s Constitutional Challenge Under Amendment 1A.** N.S. argues that Amendment 1A should shift the burden of proof under Iowa Code section 724.31 from the petitioner to the State and that on this record, Amendment 1A compels restoration of his firearm rights. The State argued, and the district court ruled, that Amendment 1A does not apply retroactively to the 2006 mental health commitment adjudication that triggered N.S.'s firearm prohibition under federal law. *See State v. Bates*, 305 N.W.2d 426, 427 (Iowa 1981) (applying the "general rule" that "constitutional provisions operate prospectively"); *see also State v. Merritt*, 467 S.W.3d 808, 811–812 (Mo. 2015) (en banc) (per curiam) (holding that amendment to Missouri's right to bear arms provision requiring strict-scrutiny review applied only prospectively). We agree with the State and the district court that Amendment 1A does not apply retroactively to N.S.'s 2006 commitment adjudication.

N.S. is not mounting a collateral attack on his mental health commitment adjudication and resulting firearm prohibition in 2006; rather, he argues that Amendment 1A applies *prospectively* to this 2023 proceeding under section 724.31. We agree with N.S. on this point. *See Nahas v. Polk County*, 991 N.W.2d 770, 780 (Iowa 2023) (identifying the relevant event to determine if a new law is being applied prospectively or retroactively). The relevant event for our retroactivity analysis is the restoration hearing and ruling in 2023. We hold that Amendment 1A applies prospectively to this restoration hearing conducted and decided *after* Amendment 1A became effective.

We now must decide whether the district court correctly ruled that Iowa Code section 724.31 survives strict scrutiny under Amendment 1A. Amendment 1A differs from its counterpart in the Federal Constitution:

| Article I, section 1A of the Iowa Constitution: | Second Amendment to the U.S. Constitution: |
| --- | --- |
| The right of the people to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all restrictions of this right shall be subject to strict scrutiny. | A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed. |

We apply the text of Amendment 1A as publicly understood at the time of its enactment in 2022. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 34 (2022) ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008))). To amend the Iowa Constitution, the legislature must approve identical language in two separate general assemblies with an intervening general election, followed by ratification by a majority of Iowa voters. Iowa Const. art. X, § 1. The legislature first approved the language of Amendment 1A in 2019. S.J.R. 18, 88th Gen. Assemb., Reg. Sess. (Iowa 2019). The next general assembly approved identical language in 2021. S.J.R. 7, 89th Gen. Assemb., Reg. Sess. (Iowa 2021). Iowa voters ratified the language on November 8, 2022. Iowa Sec'y of State, *2022 General Election Canvass Summary* 217 https://sos.iowa.gov/elections/pdf/2022/general/canvsummary.pdf [https://perma.cc/J8C8-W5LY]. The Iowa Constitution did not previously include a right to bear arms provision.

By its terms, Amendment 1A recognizes a *fundamental* individual right to keep and bear arms—not an *absolute* right. *Cf. Heller*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited."). The text of Amendment 1A expressly contemplates valid restrictions on the state constitutional right to possess firearms but requires courts to apply strict scrutiny to a challenged governmental restriction. Indeed, the final sentence of the amendment would be surplusage if the right to bear arms were absolute and could never be restricted.

The impetus for Amendment 1A was a campaign by the National Rifle Association (NRA) proposing state constitutional amendments to strengthen firearm rights. Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. 1455–56 (2019) [hereinafter Pettys]. "The N.R.A.'s amendment campaign focuses on adopting the word 'fundamental' to describe the right to keep and bear arms and on requiring strict scrutiny for any governmental restraints placed upon that right." *Id.* at 1465. Iowa is the fourth state after Alabama,[2] Louisiana,[3] and Missouri,[4] to adopt the NRA-model strict-scrutiny amendment.

---

[2]Article I, section 26 of the Alabama Constitution was amended in 2014 as follows:

(a) ~~That every~~ Every citizen has a <u>fundamental</u> right to bear arms in defense of himself <u>or herself</u> and the state. <u>Any restriction on this right shall be subject to strict scrutiny. (b) No citizen shall be compelled by any international treaty or international law to take an action that prohibits, limits, or otherwise interferes with his or her fundamental right to keep and bear arms in defense of himself or herself and the state, if such treaty or law, or its adoption, violates the United States Constitution.</u>

Alabama has a restoration procedure like Iowa's. *See* Ala. Code § 22-52-10.8(b) (2024).

[3]Article I, section 11 of the Louisiana Constitution was amended in 2012 as follows:

The right of each citizen to keep and bear arms <u>is fundamental and</u> shall not be ~~abridged~~ <u>infringed.</u> ~~but this provision shall not prevent the passage of laws to prohibit the carrying of weapons concealed on the person.~~ <u>Any restriction on this right shall be subject to strict scrutiny.</u>

[4]Article I, section 23 of the Missouri Constitution was amended in 2014 as follows:

That the right of every citizen to keep and bear arms<u>, ammunition, and accessories typical to the normal function of such arms,</u> in defense of his home,

"[L]awmakers had simply feared that the Court's 5–4 rulings in *Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion),] 'might later be threatened by a change in the composition of the Supreme Court.' " Pettys, 104 Iowa L. Rev. at 1473 & n.108 (quoting *State v. Draughter*, 130 So. 3d 855, 861 n.6 (La. 2013)); *see also Dotson v. Kander*, 464 S.W.3d 190, 201–02 (Mo. 2015) (en banc) (per curiam) (Fischer, J., concurring) (noting proponents of the Missouri amendment "wanted to make sure that our state constitutional protection of the right to bear arms remains at least as protective as *Heller* and *McDonald*" given the "mere 5−4 majority" in those cases).

We found no cases adjudicating strict-scrutiny challenges to restoration procedures in those states. Notably, Missouri's restoration statute requires that petitioners prove by clear and convincing evidence (a higher standard than Iowa's preponderance of the evidence) that they are no longer a danger to society. Mo. Rev. Stat. § 571.092 (2024). Importantly, however, courts in Louisiana and Missouri have repeatedly rejected strict-scrutiny challenges to the state's existing categorical firearm prohibitions. *See, e.g.*, *State v. Eberhardt*, 145 So. 3d 377, 385 (La. 2014) (felon-in-possession statute); *State v. Webb*, 144 So. 3d 971, 978, 983 (La. 2014) (firearm possession while using or distributing illegal drugs prohibition); *State ex rel. J.M.*, 144 So. 3d 853, 860–62 (La. 2014) (juvenile

---

person, family and property, or when lawfully summoned in aid of the civil power, shall not be questioned; but this shall not justify the wearing of concealed weapons. The rights guaranteed by this section shall be unalienable. Any restriction on these rights shall be subject to strict scrutiny and the state of Missouri shall be obligated to uphold these rights and shall under no circumstances decline to protect against their infringement. Nothing in this section shall be construed to prevent the general assembly from enacting general laws which limit the rights of convicted violent felons or those adjudicated by a court to be a danger to self or others as result of a mental disorder or mental infirmity.

Missouri's restoration statute requires a showing of clear and convincing evidence by the petitioner, which is more demanding than Iowa's preponderance of the evidence standard. *See* Mo. Rev. Stat. § 571.092 (2024).

possession of firearms prohibition); *Draughter*, 130 So. 3d at 867–68 (felons still under state supervision restriction); *Alpert v. State*, 543 S.W.3d 589, 597 (Mo. 2018) (en banc) (felon-in-possession statute); *State v. Clay*, 481 S.W.3d 531, 538 (Mo. 2016) (en banc) (nonviolent felons restriction); *State v. McCoy*, 468 S.W.3d 892, 899 (Mo. 2015) (en banc) (per curiam) (felon-in-possession statute); *Merritt*, 467 S.W.3d at 815–16 (same). The Louisiana Supreme Court reasoned that the state statute prohibiting the juvenile possession of handguns "is the type of long-standing limitation on the right to keep and bear arms with which voters were familiar" when they ratified the strict-scrutiny amendment. *State ex rel. J.M.*, 144 So. 3d at 862.

We agree that "[t]hese cases, although not binding on this Court, demonstrate the addition of strict scrutiny to the constitution does not mean that laws regulating the right to bear arms are presumptively invalid as the dissent suggests." *Dotson*, 464 S.W.3d at 198 (majority op.).

> The right to bear arms "is not unlimited" and there are still "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

*Id.* (quoting *Heller*, 554 U.S. at 626–27).

Amendment 1A is the only provision in the Iowa Constitution that expressly prescribes the standard of review for the court.[5] No judicial standard of review is codified in the Bill of Rights or any other provision in the United States Constitution. As required by Amendment 1A, we will apply strict scrutiny to the restoration procedures in Iowa Code section 724.31.

---

[5]A newly enacted Iowa statute, the Religious Freedom Restoration Act, also requires courts to apply strict scrutiny to challenged governmental actions that substantially burden the free exercise of religion. 2024 Iowa Acts ch. 1003 (to be codified at Iowa Code Ch. 675 (2025)).

Strict scrutiny has a well-established public meaning. "Considered the 'most rigorous and exacting standard of constitutional review,' strict scrutiny is generally satisfied only if the law at issue is 'narrowly tailored to achieve a compelling interest.' " *Id.* at 197 (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)). Yet, "[t]here is no settled analysis as to how strict scrutiny applies to laws affecting the fundamental right to bear arms, which has historically been interpreted to have accepted limitations." *Id.* "That strict scrutiny applies 'says nothing about the ultimate validity of any particular law; that determination is the job of the court applying' the standard." *Id.* (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995)).

Under strict scrutiny, it is the State's burden to show section 724.31 "serves a compelling state interest and is the least restrictive means of attaining that interest." *Zimmerman*, 810 N.W.2d at 16; *see also AFSCME Iowa Council 61*, 928 N.W.2d at 41 (requiring the restriction to be "narrowly tailored"). The State argues that it has a "compelling interest in protecting the public from the potential threat posed by gun ownership by citizens who do not abide by the law or are otherwise considered to create a greater risk for the community." The State further argues that section 724.31 is narrowly tailored to serve that interest "by prohibiting gun ownership by the narrow class of people that have been adjudicated as mentally ill or dangerous under federal law." N.S. argues that the State "simply does not have a compelling interest in preventing law-abiding and responsible individuals from owning firearms." He argues that section 724.31 is unconstitutionally overbroad as applied to deny his restoration petition without evidence showing that he is currently dangerous.

Like the Missouri Supreme Court in *Dotson v. Kander*, the district court relied on Supreme Court precedent under the Second Amendment that

supported longstanding prohibitions on firearm possession by groups considered

dangerous:

> The State has a compelling interest in "prohibiting the possession of firearms by felons and the mentally ill" which has been recognized to meet constitutional scrutiny by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. [at 626,] and *McDonald v. Chicago*, 561 U.S. [at 786].
>
> Iowa courts have similarly held that "[t]he Second Amendment right recognized in *Heller*, while deemed fundamental, is not without limits. As the Court there stated, '[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill,' among other prohibitions." *Heller*, 554 U.S. at 626–627. See *State v. Grimes*, [No. 12–0675, 2012 WL 5601848] (Iowa [Ct.] App. [Nov. 15,] 2012).

(Third and fourth alterations in original.) Indeed, the Supreme Court has long described prohibitions on firearm possession by felons and the "mentally ill" as "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 627 n.26. Federal courts continue to rely on that language in *Heller* when adjudicating Second Amendment challenges to categorical prohibitions.

In *United States v. Rahimi*, the Supreme Court recently addressed a categorical prohibition when it rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8), which prohibits firearm possession by persons subject to a domestic violence restraining order. *United States v Rahimi*, 144 S. Ct. 1889, 1902 (2024). The *Rahimi* Court stated,

> While we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse, see *Heller*, 554 U.S., at 626, 128 S. Ct. 2783, we note that Section 922(g)(8) applies only once a court has found that the defendant "represents a credible threat to the physical safety" of another.

*Rahimi*, 144 S. Ct. at 1901–02. Such a threshold requirement for prohibiting firearm possession is satisfied here: N.S. was found by the court to be a danger

to himself when he was committed for mental health treatment in 2006. N.S. does not attempt to collaterally attack that 2006 adjudication.

The Supreme Court also noted that the federal statute's "restriction was temporary as applied to Rahimi" and that "[s]ection 922(g)(8) only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Id.* at 1902. In our view, such a present dangerousness requirement is satisfied by a judicial determination under Iowa Code section 724.31. The district court determined that N.S. in 2023 failed to prove that he "will not be likely to act in a manner dangerous to the public safety." And as set forth above, we have affirmed that judicial finding on our de novo review.

The State's appellate brief relied on the 2023 decision in *United States v. Jackson*, which rejected a Second Amendment challenge to 18 U.S.C. section 922(g)(1), the federal statute prohibiting felons from possessing firearms. 69 F.4th 495, 505–06 (8th Cir. 2023). After the State filed its appellate brief, the Supreme Court vacated the judgment and remanded the case to the Eighth Circuit for further consideration in light of *Rahimi. See Jackson v. United States*, 144 S. Ct. 2710 (2024) (mem.). On remand, the Eighth Circuit reached the same conclusion upholding the prohibition on firearm possession by felons, even those like Jackson with only nonviolent felony convictions. *United States v. Jackson*, 110 F.4th 1120, 1125–26 (8th Cir. 2024). Judge Colloton wrote for a unanimous panel, reiterating continued reliance on *Heller*:

> We conclude that the district court was correct that § 922(g)(1) is not unconstitutional as applied to Jackson based on his particular felony convictions. The Supreme Court has said that nothing in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L.Ed.2d 637 (2008), which recognized an individual right to keep and bear arms, "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 128 S. Ct. 2783; *see McDonald v. City of Chicago*, 561 U.S. [at 786] ("We repeat those assurances here."). The decision in [*New York*

*State Rifle & Pistol Association, Inc. v.*] *Bruen*, which reaffirmed that the right is "subject to certain reasonable, well-defined restrictions," 597 U.S. at 70, 142 S. Ct. 2111, did not disturb those statements or cast doubt on the prohibitions. *See id.* at 72, 142 S. Ct. 2111 (Alito, J., concurring); *id.* at 81, 142 S. Ct. 2111 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id.* at 129, 142 S. Ct. 2111 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.). Neither did the decision in *Rahimi. See* 144 S. Ct. at 1901–02. Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).

*Id.*

Thus, under Second Amendment precedent, Congress arguably may still ban firearm possession by certain categories of persons without individualized adjudications of present danger. But Second Amendment precedent provides only limited guidance for our strict-scrutiny review of Amendment 1A challenges because federal courts have moved away from intermediate or strict scrutiny in favor of the "text, history, and tradition" test.[6] *See Bruen*, 597 U.S. at 24. Nevertheless, federal decisions applying heightened scrutiny to firearm restrictions before *Bruen* provide persuasive authority for adjudicating strict-scrutiny challenges to firearm regulations challenged under Amendment 1A. And sister-state cases adjudicating strict-scrutiny challenges under their constitutions provide additional persuasive authority.

---

[6]Courts applying *Bruen*'s "text, history, and tradition" test under the Second Amendment challenges to contemporary firearm laws must engage in a search for analogous restrictions in the founding era. *See, e.g.*, *United States v. Weathers*, No. 4:23–CR–00031–WMR, 2024 WL 2871356, *17–20 (N.D. Ga. Mar. 11, 2024) (surveying caselaw and historical evidence to reject Second Amendment challenge to § 922(g)(4)); *United States v. Gould*, 672 F. Supp. 3d 167, 182–84 (S.D.W.V. 2023) (examining "history and tradition from England, the colonial and founding periods, and the nineteenth century to determine . . . founding-era understanding of the Second Amendment" and holding that "because there is a historical basis for disarming individuals that have been determined to be dangerous to themselves and/or the public at large, § 922(g)(4) is constitutional on its face"). A text, history and tradition test would be easier to apply here because legislators and voters were aware of Iowa firearm laws on the books in 2022 at the time of Amendment 1A's enactment. But the amendment itself mandates we apply strict scrutiny.

The first step in our strict-scrutiny analysis is to identify the "compelling" government interest served by the challenged law. Some studies have shown individuals with mental disorders are more likely to perpetrate violent crimes or commit suicide. *See, e.g.,* Fredrick E. Vars & Amanda Adcock Young, *Do the Mentally Ill Have a Right to Bear Arms?*, 48 Wake Forest L. Rev. 1, 16, 21 (2013) ("Ninety percent (or more) of suicide victims in the United States suffered from mental illness."). "A suicide attempt with a firearm rarely affords a second chance." Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New Eng. J. Med. 989, 990 (2008). Because of this, federal courts reviewing Second Amendment challenges to section 922(g)(4)'s prohibition on firearm possession after a mental health commitment have recognized a "compelling" government interest in "preventing crime and preventing suicide." *Mai v. United States*, 952 F.3d 1106, 1116 (9th Cir. 2020) (relying on *Washington v. Glucksberg*, 521 U.S. 702, 730–35 (1997), for the proposition that suicide prevention is an "unquestionably important" and legitimate interest); *see Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted." (quoting *De Veau v. Braisted*, 363 U.S. 144, 155 (1960))); *United States v. Johnson*, No. CR15–3035–MWB, 2016 WL 614727, *2, *7 (N.D. Iowa Feb. 16, 2016) (applying strict scrutiny and determining that prohibiting the mentally ill from possessing firearms serves compelling state interests in "reducing gun violence" and "protecting society from violent crime and preventing suicides"). We likewise hold the State has a compelling interest in preventing gun violence and suicide.

The fighting issue is whether section 724.31 is narrowly tailored to serve that interest. "Strict scrutiny is not 'strict in theory, but fatal in fact.' " *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand Constructors*, 515 U.S. at

237). The dissent appears to demand not just narrow tailoring but perfect tailoring. However, the Supreme Court has rejected this view by saying, "Narrow tailoring does not require exhaustion of every conceivable . . . alternative." *Grutter*, 539 U.S. at 339. Instead, it simply demands the challenged law "not unduly harm members of any . . . group." *Id.* at 341. "[O]n the standard we apply here, the statute need not be perfectly tailored, simply narrowly tailored." *State v. Smith*, 571 A.2d 279, 281 (N.H. 1990) (rejecting state constitutional strict-scrutiny challenge to felon-in-possession law even though some felons are not potentially dangerous). This is the standard we will apply.

Applying strict scrutiny under its state constitution, the Louisiana Supreme Court unanimously held the state felon-in-possession law was narrowly tailored "to protect the safety of the general public from felons convicted of specified serious crimes, who have demonstrated a dangerous disregard for the law and the safety of others and who present a potential threat of further or future criminal activity." *Eberhardt*, 145 So. 3d at 385. The Louisiana statute was narrowly tailored in part because it prohibited firearm possession not for life but rather for ten years after the completion of sentence. *Id.* Iowa law allows persons prohibited from firearm possession by reason of a mental health commitment to petition for restoration of their firearm rights every two years. Iowa Code § 724.31(4). A divided Missouri Supreme Court rejected an overbreadth challenge to hold that the state's broader felon-in-possession statute, which included nonviolent felonies, was still narrowly tailored to survive strict scrutiny even without a ten-year sunset. *Clay*, 481 S.W.3d at 535–36 (noting that the Missouri statute did not include "misdemeanors, felony convictions that have been pardoned, or possession of antique firearms"). The dissenting justice argued the law was not narrowly tailored because it included

nonviolent felonies. *Id.* at 538–39 (Teitelman, J., dissenting). As noted, N.S. was adjudicated a danger to himself or others in 2006 and does not challenge that adjudication. And as also noted, Iowa Code section 724.31 allows restoration of firearm rights under a lesser standard of proof than Missouri's restoration statute, which requires clear and convincing evidence.

We emphasize that merely because someone was involuntarily committed for mental health treatment years ago does not mean they are dangerous today. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc) (declining to judicially endorse Congress's power to declare: "Once mentally ill, always so."). Federal law allows states to alleviate this concern through procedures for the restoration of firearm rights to individuals who show they are no longer "likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 34 U.S.C. § 40915(2). Iowa and a majority of other states have enacted restoration procedures in response to this statute. Iowa Code § 724.31; *Tyler*, 837 F.3d at 683.

When no restoration procedure is available, some courts have allowed Second Amendment challenges to proceed against section 922(g)(4)'s lifetime prohibition on firearm possession. *See, e.g., Tyler*, 837 F.3d at 681, 694 (reinstating Second Amendment challenge and noting that "there is no path available for Tyler to seek the restoration of his Second Amendment right" because the federal restoration program "remains unfunded" and "Michigan has not chosen to create a qualifying relief program"); *id.* at 707, 710 (Sutton, J., concurring in most of the judgment) ("Tyler is not demanding a gun today. He is

demanding only what Congress used to permit and what most States still permit: an opportunity to show that he is not a risk to himself or others.").[7]

But when a restoration procedure is available, courts have rejected Second Amendment challenges to section 922(g)(4). *See, e.g., United States v. Bartley,* 9 F.4th 1128, 1135–36 & n.4 (9th Cir. 2021) ("Idaho's provision for the restoration of rights under § 922(g)(4) means that Bartley's prohibition is not a lifetime ban, in effect regardless of later mental health status."); *Johnson,* 2016 WL 614727, at *7. In *United States v. Johnson,* Judge Bennett determined section 922(g)(4) withstood an as-applied Second Amendment challenge under strict scrutiny and was narrowly tailored given the availability of Iowa's restoration statute:

> Under § 724.31, Johnson could have sought the restoration of his right to keep and bear arms by showing (a) that he will not be likely to act in a manner dangerous to the public safety and (b) that granting relief will not be contrary to the public interest. IOWA CODE § 724.31(4). Thus, Iowa's relief-from-disabilities statute significantly mitigates § 922(g)(4)'s burden on an individual's Second Amendment rights while furthering the government's substantial interest in protecting the public safety.

*Id.* We reach the same conclusion under Amendment 1A. Section 724.31 provides a procedure for restoration of firearm rights upon the petitioner's showing that he "will not be likely to act in a manner dangerous to public safety." The firearm prohibition remains in place only for those petitioners who fail to

---

[7]In *Sagely v. Hutchinson,* a divided Arkansas Supreme Court recently rejected claims that the absence of a restoration procedure for previously committed mental patients violated the Equal Protection Clause when a restoration statute was available for nonviolent felons. 685 S.W.3d 238, 244 (Ark. 2024). Two dissenting justices applied strict scrutiny and argued that the "State's blanket prohibition with no path to restoration for anyone involuntarily committed, while providing multiple paths for restoration of rights to felons, requires a finding [the blanket prohibition] is not narrowly tailored to achieve the governmental interest and violates the Equal Protection Clause." *Id.* at 254 (Wood, J., dissenting). The dissenters would have allowed the Arkansas legislature an opportunity to enact a restoration process for former mental health patients. *Id.* at 255. Iowa already has such a restoration process codified in Iowa Code section 724.31.

make that showing. The prohibition is not permanent; petitioners can reapply every two years. Iowa Code § 724.31(4). We hold that section 724.31 is narrowly tailored to serve a compelling state interest in preventing gun violence and suicides.

N.S. argues that Amendment 1A requires shifting the burden of proof from the petitioner to the State in section 724.31 proceedings. We disagree. N.S. cites no case, and we found none, that holds the Second Amendment or any state constitutional firearm clause requires shifting the burden of proof to the government to oppose restoration. To the contrary, the Second Amendment is satisfied by a restoration procedure in which the previously committed "individual will have to make a threshold showing that he can possess a gun safely today," and "the government may present contrary evidence if it wishes." *Tyler*, 837 F.3d at 713 (Sutton, J., concurring in most of the judgment) (agreeing that "no one would get a [restoration] hearing without making a threshold showing, premised on medical evidence, that they are fit to possess a gun"). N.S. concedes that under Amendment 1A, the burden of *production* remains on the petitioner. And recall that the State originally had the burden under chapter 229 to prove by clear and convincing evidence that N.S. was a threat to himself or others to compel his involuntary hospitalization for mental health treatment.

We hold that Amendment 1A does not require shifting the burden of proof to the State in section 724.31 proceedings to prove the petitioner is dangerous. The concurrence agrees. As discussed in our statutory analysis, placing the burden on the petitioner seeking relief aligns with ordinary practices. *See* Iowa R. App. P. 6.904(3)(*e*); *Weast*, 546 U.S. at 56–58; *cf. In re A.S.*, 906 N.W.2d at 475–76 (placing burden of proof on parent to prove statutory exception to termination of fundamental parental rights). The petitioner possesses the

relevant information; he knows where he received mental health and substance abuse treatment and who can vouch for his character and his safety with firearms. "[T]he ordinary rule, based on considerations of fairness, does not place the burden [of proof] upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *Weast*, 546 U.S. at 60 (quoting *United States v. N.Y., New Haven & Hartford R.R.,* 355 U.S. 253, 256 n.5 (1957)). And shifting the burden of proof rarely will change the outcome. *See id.* at 58 ("In truth, however, very few cases will be in evidentiary equipoise."). The dissent fails to cite a single case from any jurisdiction applying strict scrutiny to shift a statutory burden of persuasion to the government in a restoration proceeding or in any other type of case.[8] Iowa Code section 724.31 "need not be perfectly tailored, simply narrowly tailored." *See Smith*, 571 A.2d at 281.

A contrary holding would create practical problems and likely necessitate some form of a more intrusive court-created protocol to allow the state to depose the petitioner and family members and the option to compel the petitioner to undergo a mental health examination, disclose healthcare providers, and identify

---

[8]The dissent quotes from *In re C.M.*, where we rejected a constitutional challenge to revised appellate rules expediting briefing in cases terminating parental rights. 652 N.W.2d 204, 210 (Iowa 2002). That case did not involve changing a statutory burden of proof but rather determined the appellate rules would survive strict scrutiny as "narrowly tailored to address the State's compelling interest" in "obtaining a permanent home for a child as soon as possible." *Id.* at 211. The dissent also relies in part on cases holding the defendant bears the burden of production on an affirmative defense that triggers the state's burden of persuasion to disprove. *State v. Bailey*, 2 N.W.3d 429, 435 (Iowa 2024) (requiring a criminal defendant to present sufficient facts to invoke an affirmative defense to extortion); *State v. Wilt*, 333 N.W.2d 457, 463 (Iowa 1983) (requiring a criminal defendant to present sufficient facts to invoke a statutory exception to criminal gambling). Those cases applied statutory interpretation and common law principles not a constitutional strict-scrutiny analysis. *See Bailey*, 2 N.W.3d at 435 (applying statutory interpretation); *Wilt*, 333 N.W.2d at 462 ("Our holding the exceptions of chapter 99B constitute affirmative defenses obviates our consideration of these constitutional issues. We consistently have ruled, on common-law grounds, that an affirmative defense places the burden of going forward with evidence, or production, on the defendant, but leaves the burden of persuasion on the prosecution." (citation omitted)). The dissent and concurrence agree that the legislature placed the burden of proof on the petitioner in Iowa Code section 724.31.

and release confidential mental health treatment records. *Cf. Fagen v. Grand View Univ.*, 861 N.W.2d 825, 835 (Iowa 2015) (engrafting a multi-factor protocol for discovery of the plaintiff's mental health records under Iowa Code section 622.10(3)); *id.* at 839–41 (Mansfield, J., dissenting) (criticizing court's protocol). There is no indication in our record or counsel's argument that the State currently employs discovery in contesting restoration claims.

A contrary holding would also call into question our precedent on extending no-contact orders that prohibit firearm possession under 18 U.S.C. § 922 (g)(8). Defendants opposing the extension of a no-contact order under Iowa Code section 664A.8 have "the burden of proof to demonstrate by a preponderance of the evidence that they no longer pose a threat to the protected party." *See State v. Petro*, 981 N.W.2d 686, 691 (Iowa 2022); *Vance*, 907 N.W.2d at 482 ("Consequently, if the defendant proves by a preponderance of the evidence that he or she no longer poses a threat to the protected persons, the court should not extend the no-contact order for an additional five years."). The dissent offers no rebuttal to this point.

As noted, Iowa Code section 724.31 adopted verbatim the proof requirements from the federal act, 34 U.S.C. § 40915, that conditioned funding on use of its language. *In re A.M.*, 908 N.W.2d at 284 n.4. While section 40915 is silent on the burden of proof, we have found no authority construing the federal enactment to place that burden on the government.[9]

---

[9]At oral argument, counsel for the State, without citing any authority or record evidence, warned that shifting the burden of proof to the government would jeopardize federal funding. We found no support for the argument that federal funding is conditioned upon leaving the burden of proof on the petitioner. To the contrary, federal funding is contingent on (1) a procedure for applying for relief from the federal firearm ban, (2) a de novo judicial appeal process, and (3) a requirement to update records by removing the person's name from firearm prohibition databases. Liza H. Gold & Donna Vanderpool, *Legal Regulation of Restoration of Firearms Rights After Mental Health Prohibition*, 46 J. Am. Acad. Psychiatry & L. 298, 301 (2018). Iowa Code section 724.31 complies with those conditions.

In most states, "the burden falls on the petitioner to prove by a preponderance of the evidence that he should be entitled to restoration relief." Robert Luther III, *Taking Aim at Recent Legislative Proposals to Curb Gun Violence from Mental Illness: A Second Amendment Response,* 53 Har. J. on Legis. 369, 378 (2016) [hereinafter Luther].[10] Texas, for example, the second most populous state and a jurisdiction not considered unfriendly to firearm rights, like most other states, places "the burden of proof on [the petitioner] to remove his firearms disability and restore his right to purchase and possess firearms." *In re State for J.M.P.,* 687 S.W.3d 746, 757 (Tex. App. 2024). California is the lone exception, where the legislature chose to place the burden of proof on the state. *See* Cal. Welf. & Inst. Code § 8103(f)(6) (West 2024) ("The people shall bear the burden of showing by a preponderance of the evidence that the person would not be likely to use firearms in a safe and lawful manner."); *see also People v. Jason K.,* 116 Cal. Rptr. 3d 443, 451 (Ct. App. 2010) (holding that the "preponderance of the evidence" standard for denial of relief from a firearm prohibition did not violate the Second Amendment).

The Iowa Legislature, if it chooses, is free to revise Iowa Code section 724.31 to shift the burden of proof to the state or even require the state to prove current dangerousness beyond a reasonable doubt or by clear and convincing evidence. If the same Iowa legislators who approved Amendment 1A saw section 724.31 "as part of the problem they were aiming to solve, [we] might well ask, why didn't they repeal the legislation, rather than launch the

---

[10]This commentator agreed with the report by the Consortium for Risk-Based Firearms Policy's *Guns, Public Health, and Mental Illness: An Evidence-Based Approach for State Policy*, which "recommends (1) the petitioner should bear the burden of initiating the restoration procedure; (2) [the petitioner] should bear the burden of proof at the restoration hearing; and (3) the burden of proof the petitioner has to satisfy should be a preponderance of the evidence." Luther, 53 Har. J. on Legis. at 378–79. Iowa Code section 724.31 comports with those recommendations.

cumbersome amendment process and leave the objectionable law's fate to the vagaries of future litigation?" Pettys, 104 Iowa L. Rev. at 1471 (footnote omitted). The Iowa legislature, which twice approved the language of Amendment 1A, has not amended section 724.31, nor in our view is it required to do so by Amendment 1A. We decline to judicially shift the burden of proof to the state. N.S.'s constitutional challenge fails.

**IV. Disposition.**

For these reasons, we affirm the judgment of the district court denying N.S.'s petition for restoration of his firearm rights.

**Affirmed.**

Christensen, C.J., joins this opinion, and McDonald and Oxley, JJ., join as to parts I, II, III.A, and IV. McDonald, J., files an opinion concurring in part and concurring in the judgment, in which Oxley, J., joins. McDermott, J., files a dissenting opinion, in which Mansfield and May, JJ., join.

**McDonald, Justice (concurring in part and concurring in the judgment).**

I concur in the court's determination that N.S. failed to prove by a preponderance of the evidence that the federal disability making it illegal for him to own or possess a firearm should be removed. I also concur in the court's conclusion that article I, section 1A of the Iowa Constitution does not require the burden of proof to be placed on the state in a proceeding to remove the federal firearm disability; however, I reach that conclusion for a reason different than that expressed by the court. I thus write separately on the constitutional question presented.

"The law relating to relief from a federal firearms disability involves" a complex "intersection of federal and state laws." *In re State ex rel. J.M.P.,* 687 S.W.3d 746, 755 (Tex. App. 2024). N.S. was involuntarily committed in 2006 following an individualized determination that he was seriously mentally impaired and was likely to physically injure himself or others if allowed to remain at liberty. *See* Iowa Code §§ 229.1(16)(*a*), .6, .11, .14 (2006). Once N.S. was involuntarily committed, federal law prohibited him from owning or possessing a firearm. *See* 18 U.S.C. § 922(d)(4), (g)(4) (2006). In 2008, Congress passed the NICS Improvement Amendments Act of 2007. *See* Pub. L. No. 110-180, 121 Stat. 2559. The Act authorized states to establish programs that would allow persons to seek relief from the firearms disability imposed by federal law. *See* Pub. L. No. 110-180, §§ 103–05, 121 Stat. 2559, 2568–70 (codified at 34 U.S.C. § 40915). Under these programs, "If . . . an application for relief . . . is granted with respect to an adjudication or a commitment to a mental institution . . . , the adjudication or commitment . . . is deemed not to have occurred for purposes of subsections (d)(4) and (g)(4) of section 922 of title 18." 34 U.S.C. § 40915(b). In

other words, the underlying adjudication or commitment is erased from the books for the purposes of the disability imposed by 18 U.S.C. § 922(d)(4) and (g)(4).

In 2010, Iowa chose to implement the federally authorized relief from disabilities program. *See* 2010 Iowa Acts ch. 1178, § 17 (codified at Iowa Code § 724.31 (2011)). Under the Iowa program, a person subject to the federal firearms "disabilities imposed by 18 U.S.C. § 922(d)(4) and (g)(4) because of an order or judgment that occurred under the laws of this state may petition . . . for relief from the disabilities imposed" by federal law. Iowa Code § 724.31(2) (2022). The district court "shall grant a petition for relief . . . if the court finds by a preponderance of the evidence that the petitioner will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." *Id.* § 724.31(4). While the statute provides that the district court must make its substantive findings by a preponderance of the evidence, the statute does not explicitly provide who bears the burden of proof. *See id.*

The parties disagree about who bears the burden of proof. N.S. contends that article I, section 1A requires the burden of proof be placed on the state—that is, for the federal firearms disability to continue to apply, the State must prove that N.S. is likely to act in a manner dangerous to public safety and that granting N.S. relief would be contrary to the public interest. The State disagrees. It contends that the petitioner, the party seeking relief, typically bears the burden of proof and that placing the burden of proof on the petitioner does not violate the constitutional strict-scrutiny standard imposed by article I, section 1A.

In my view, both sides miss a threshold issue: Does article I, section 1A even do any work here? *See* Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny*

*Amendments*, 104 Iowa L. Rev. 1455, 1481 (2019) (stating that courts should "consider, as a threshold matter, whether the facts in a given claimant's case bring the fundamental right to keep and bear arms into play" and that "states with strict-scrutiny amendments have largely failed to give this gateway question its due, resulting in occasionally problematic rulings"). I conclude that it does not.

> Effective November 8, 2022, article I, section 1A provides:

> The right of the people to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all restrictions of this right shall be subject to strict scrutiny.

Iowa Const. art. I, § 1A. By its explicit terms, article I, section 1A subjects to strict scrutiny state infringements or restrictions of the state constitutional right to keep and bear arms.

Iowa Code section 724.31 is neither an infringement nor a restriction of the state constitutional right to keep and bear arms. The law infringing or restricting N.S. from owning or possessing a firearm is a disability imposed by federal law. *See* 18 U.S.C. § 922(d)(4), (g)(4). Section 724.31 was enacted pursuant to a federal law that authorized states to implement programs to provide relief from the federal firearms disability. *See* 34 U.S.C. § 40915. Section 724.31 is thus an enlargement or expansion of the right to keep and bear arms rather than an infringement or restriction of the right to keep and bear arms. In the absence of section 724.31—which the state had no legal obligation to adopt—article I, section 1A could not have provided N.S. with any ability to own or possess a firearm because state constitutional provisions are inferior to and cannot override federal statutes. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in

Pursuance thereof . . . , shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *United States v. Leach*, 639 F.3d 769, 772 (7th Cir. 2011) (stating that state constitutional provisions cannot override federal law), *overruled on other grounds by Koch v. Village of Hartland*, 43 F.4th 747 (7th Cir. 2022); *United States v. Baer*, 235 F.3d 561, 562 (10th Cir. 2000) (rejecting "contention that [defendant's] federal weapons prosecution was improper because the Utah constitution gives him the right to bear arms"). Because Iowa Code section 724.31 is an enlargement or expansion of the right to keep and bear arms rather than an infringement or restriction of the right to keep and bear arms, article I, section 1A, and its attendant strict-scrutiny standard, is inapplicable here.

N.S. nonetheless contends that Iowa Code section 724.31 is still a restriction on the right to keep and bear arms. As N.S. sees things, once the state opens the door and accepts the federal government's invitation to establish a program to relieve the federal firearms disability, the state constitution requires the state to open the door as wide as possible. In N.S.'s view, this means that the burden of proof must be placed on the state. I disagree. N.S. cites no authority for the argument. Further, N.S.'s argument ignores the relevant legal context, most notably that N.S. was already deemed seriously mentally impaired and a physical threat to himself and others in an individualized judicial proceeding. Once that fact was legally established, it is naturally N.S.'s burden to prove he is no longer dangerous rather than the State's obligation to prove something already legally established. Further, N.S. does not take his argument to the logical end (nor do the dissenters in this case). If strict scrutiny required the narrowest possible tailoring, as N.S. and the dissenters contend, then shifting the burden of proof to the state would not be enough. Instead, the

standard of proof would also have to be raised from preponderance of the evidence to clear and convincing evidence or even proof beyond a reasonable doubt. But neither N.S. nor the dissenters advocate for that.

The question of which party bears the burden of proof under section 724.31 is merely a nonconstitutional inquiry that requires the application of well-established legal rules. The "ordinary default rule" is that when a statute "is silent . . . as to which party bears the burden of persuasion[,] . . . the burden lies . . . on the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51, 56–58 (2005); *see* Iowa R. App. P. 6.904(3)(*e*) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established."); *In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018) (applying rule 6.904(3)(*e*)). There is no reason to deviate from the ordinary default rule in this case. To the contrary, the relevant authorities conclude the burden of proof should be placed on the petitioner seeking relief from the federal firearms disability. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 707–14 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment) ("The individual will have to make a threshold showing that he can possess a gun safely today."); *In re A.M.*, 908 N.W.2d 280, 285 (Iowa Ct. App. 2018) (stating the petitioner had the burden of proof); *In re State of J.M.P.*, 687 S.W.3d at 757 (holding the petitioner "had the burden of proof on his petition to remove his firearms disability and restore his right to purchase and possess firearms"); Robert Luther III, *Taking Aim at Recent Legislative Proposals to Curb Gun Violence from Mental Illness: A Second Amendment Response*, 53 Harv. J. on Legis. 369, 378 (2016) (stating that in most states, "the burden falls on the petitioner to prove by a preponderance of the evidence that he should be entitled to restoration relief").

For these reasons, I concur in parts I, II, III.A, and IV of the court's opinion, and I concur in the court's judgment.

Oxley, J., joins this concurrence.

**McDermott, Justice (dissenting).**

The majority holds that the procedure in Iowa Code § 724.31 to restore the right to possess a firearm satisfies strict scrutiny. Because I think that the majority fails to properly apply the strict-scrutiny test to the statute, I respectfully dissent.

Unlike all other rights enumerated in the Iowa Constitution, "the right to keep and bear arms" secured in article I, section 1A (or "Amendment 1A") is specifically identified as "a fundamental right." Iowa Const. art. I, § 1A. In addition, Amendment 1A explicitly states that "[a]ny and all restrictions on this right shall be subject to strict scrutiny." *Id.*

Strict scrutiny, both as a concept and an analytical tool, is well-established in our caselaw. It is the most exacting standard of constitutional review, placing "all the burden of justification on the State." *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 731 (Iowa 2022). It requires the state to show that the challenged action is "narrowly tailored" to achieve "a compelling state interest," and requires the state to use "the least restrictive means" in doing so. *Mitchell County v. Zimmerman*, 810 N.W.2d 1, 16 (Iowa 2012).

As relevant here, federal law denies the right to possess firearms for anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution." 18 U.S.C. § 922(g)(4). In response to an application for civil commitment, a district court ordered N.S.'s participation in outpatient treatment when he was a juvenile, triggering the indefinite revocation of his firearm possession rights.

But federal law also authorizes states to restore firearm possession rights that have been revoked under § 922(g)(4). *See* 34 U.S.C. § 40915(a)(2). Iowa codified its right for people to seek restoration in Iowa Code § 724.31. That statute provides that a person whose right to possession was revoked under § 922(g)(4) must be restored "if the court finds by a preponderance of the evidence that the petitioner will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." Iowa Code § 724.31(4).

The rationale behind the restoration right merits some exposition. Let's consider the facts of this case. When he was sixteen years old, N.S.'s father and stepmother sought to have him civilly committed for serious mental impairment and drug and alcohol abuse. The allegations were that N.S. "drinks alcohol," "has used marijuana to self-medicate," "will take pain pills and/or cold medicine even though he's not been prescribed these meds," "wants to take too many Adderall that he's been prescribed," and "talks of killing himself and others." Based on these allegations, the court ordered N.S. temporarily hospitalized and scheduled a hearing for three days later. At the hearing, N.S. was released to his parents and ordered to participate in outpatient treatment. The court's order added, "[N.S.] and his parents do not think the problem is that severe." Two months later, in a review proceeding, the court found that N.S. had been compliant with outpatient treatment and dismissed the case.

About a year later, when N.S. was seventeen years old, N.S.'s mother and maternal grandmother filed a new petition to have N.S. civilly committed based on serious mental impairment but not substance abuse. This application cited threats allegedly made by N.S. to kill himself or his mother and difficulties with anger management. Based on the application, the court ordered N.S. temporarily

hospitalized and scheduled a hearing for five days later. During that time, a psychiatrist interviewed N.S., who had now left school and was working full-time. N.S. denied the allegations, criticized his mother, explained he was now living with his father, and said that "his mother should be here instead of him." The psychiatrist concluded that N.S. was not mentally ill and was not likely to injure himself or others. Instead, the psychiatrist diagnosed "behavioral issues." In light of this report, at the hearing, the district court found that N.S. was not mentally ill and dismissed the case.

In the fourteen years since that time, N.S. has married, had children, holds regular employment, has had no criminal record, and hasn't threatened to do harm to himself or anyone else. But like some other Iowans, he has been a victim of a violent crime—a home invasion—and wishes to own a firearm for self-defense purposes.

N.S. is subject to a potential lifetime ban on possessing firearms on the ground that he was "committed to a mental institution." 18 U.S.C. § 922(g)(4). *But just barely.* The 2006 order didn't require involuntary hospitalization; it simply ordered N.S. to participate in outpatient treatment, which he did successfully for a couple of months. Technically, under a federal district court's view of Iowa law, that is equivalent to being "committed to a mental institution." *See United States v. B.H.*, 466 F. Supp. 2d 1139, 1147 (N.D. Iowa 2006). But in any event, the order that N.S. enter outpatient treatment occurred nearly two decades ago, when N.S. was sixteen years old.

Mental health and substance abuse issues that cause a person to pose a danger to themselves or others (including problems that require civil commitment) do not always endure. Here, N.S.'s issues had ameliorated to the point that a year later, a psychiatrist found that he was not mentally ill or likely

to injure himself or others. The fact that N.S. posed a danger to himself or others at one time when he was sixteen and needed treatment does not mean that the problem will go unresolved in perpetuity. Indeed, N.S.'s story reads like that of many troubled youths. But he is no longer a youth.

Section 724.31 includes two types of burdens relevant to the restoration decision. It imposes a *burden of production,* meaning "[a] party's duty to introduce enough evidence of an issue to have the issue decided by the factfinder." *Burden of Production, Black's Law Dictionary* 243 (12th ed. 2024). This burden is "discharged when sufficient evidence has been introduced to support a finding that a fact exists." *Id.* Section 724.31 states that the "court *shall* receive . . . evidence offered by the petitioner." Iowa Code § 724.31(3) (emphasis added). The words "offered by the petitioner" impose the burden of production on the petitioner. *See id.* This means that a court can dismiss a petition if the petitioner fails to meet a preliminary evidentiary threshold. *See Burden of Production, Black's Law Dictionary* 243 (12th ed. 2024). Section 724.31(3) requires the petitioner to produce (1) evidence about the circumstances that gave rise to the disability in the first place, (2) mental health and criminal history records, (3) character witness statements, and (4) any changes in the petitioner's life since the disability was imposed. Iowa Code § 724.31(3)(*a*)–(*d*).

Petitioners often might be the only ones with access to certain relevant information about the petitioner's mental health history and current psychological status. "[W]here the facts with regard to an issue lie peculiarly in the knowledge of a party," that party generally bears the burden of production. *See* Charles T. McCormick, *Handbook of the Law of Evidence* § 337, at 786 (Edward W. Cleary ed., 2d ed. 1972) [hereinafter McCormick]. Placing the burden

of production on the petitioner, in my view, does not pose a constitutional problem under Amendment 1A. *See State v. Bailey*, 2 N.W.3d 429, 435 (Iowa 2024) (requiring a criminal defendant to present sufficient facts to invoke an affirmative defense to extortion); *State v. Wilt*, 333 N.W.2d 457, 463 (Iowa 1983) (requiring a criminal defendant to present sufficient facts to invoke a statutory exception to criminal gambling).

The restoration statute also imposes a *burden of persuasion*, meaning the "duty to convince the factfinder to view the facts in a way that favors that party." *Burden of Persuasion, Black's Law Dictionary* 243 (12th ed. 2024). I agree with the majority that § 724.31 places the burden of persuasion on the petitioner, but for reasons rooted in the statute's text rather than an evidentiary default rule. In response to a petitioner's petition for restoration of rights, the statute states only that the state "*may* appear, support, object to, and present evidence relevant to the relief sought by the petitioner." Iowa Code § 724.31(2) (emphasis added). "May" means the state is permitted to act but is not required to act. *See* Iowa Code § 4.1(30)(*c*); *State ex rel. Lankford v. Allbee*, 544 N.W.2d 639, 641 (Iowa 1996). Regardless of whether the state acts, the court is authorized to grant a petition only "if the court finds by a preponderance of the evidence that the petitioner" is not dangerous and it would not be against the public's interest. Iowa Code § 724.31(4). The state can do nothing and still win—the textbook effect of the burden of persuasion. *See* William F. Fox, *The "Presumption of Innocence" as Constitutional Doctrine*, 28 Cath. Univ. L. Rev. 253, 255 n.8 (stating that criminal defendants have the "right to do nothing" because in criminal law the state carries the burden of persuasion). Unlike the burden of production, the statute's placement of the burden of persuasion on the petitioner *does* present constitutional concerns.

The very point of strict scrutiny is to place the burden of justification on the party that favors the restriction. "If strict scrutiny were mandated, then the State would have the burden to show the classification was narrowly tailored to serve a compelling governmental interest." *In re C.M.*, 652 N.W.2d 204, 210 (Iowa 2002). That being the case, it is simply incongruous and wrong to force the party under the restraint to prove that the restraint no longer belongs rather than the other way around. Again, strict scrutiny requires that the state narrowly tailor its limitation on constitutional rights in the service of its compelling state interest. *Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005).

We have declared actions unconstitutional under strict scrutiny when government actors failed to establish their actions were narrowly tailored to achieve a compelling interest. In *Mitchell County v. Zimmerman*, for instance, the plaintiff challenged a county ordinance that banned driving vehicles with wheels having steel cleats on paved roadways. 810 N.W.2d at 4. A member of the Mennonite Church, which forbids members from driving tractors without steel cleats, challenged the ordinance as a violation of his constitutional right to free exercise of his religion. *Id.* The county argued that the ordinance was necessary to protect hard-surfaced roads. *Id.* We held that the county failed to establish that the ordinance was narrowly tailored to achieve the stated objective of road preservation because, among other reasons, "[a] more narrowly tailored alternative" to the county's ordinance "might allow steel wheels on county roads in some circumstances, while establishing an effective mechanism for recouping the costs of any necessary road repairs if damage occurs." *Id.*

Here, we can readily conceive of a more narrowly tailored approach—one that places the burden on the state to prove that the person under a firearms disability due to a prior civil commitment is a continuing threat, rather than the

other way around. As a constitutional matter, the majority concludes that imposing the burden of persuasion on the petitioner presents no problem.[11] But that can't be right. Who bears the burden of persuasion necessarily matters because in close cases, the burden-bearer *necessarily loses.* Under a preponderance-of-the-evidence standard, the tie-breaking consideration in close cases comes down to the burden of persuasion. Whoever owns the burden suffers defeat. "[I]t may be doubtful . . . whether he be not legally in the wrong and his adversary legally in the right, and yet he may gain and his adversary lose, simply because the inertia of the court has not been overcome . . . ." James B. Thayer, *The Burden of Proof*, 4 Harv. L. Rev. 45, 58 (1890). The burden of persuasion in close cases serves as the final—and determinative—factor to consider.

Imposing the burden of persuasion on petitioners means that in close cases courts will refuse to restore firearm possession rights even when petitioners no longer pose a danger to themselves or others. The State, for its part, makes no claim that it would be unable to achieve the same goal of keeping guns away from dangerous people if it had the burden. By placing the burden of persuasion on petitioners, § 724.31 thus does not use the least restrictive means to achieve the state's interest in keeping firearms out of the hands of dangerous people. The statute fails strict scrutiny as a result.

Notably, California—where 12% of Americans live and which is not known for having a firearm-friendly legal environment—places the burden *on the state* to prove that "the person would not be likely to use firearms in a safe and lawful manner" when a petition for relief from the lifetime ban is filed. *See* Cal. Welf. &

---

[11]As a practical matter, the majority speculates that shifting the burden of persuasion from the petitioner to the state "rarely will shift the outcome." How the majority knows this, the opinion does not say. In any event, based on the district court's own comments, this appears to be a close case where the burden *did* matter.

Inst. Code § 8103(f)(6) (2024). No one claims that California's law has proved difficult to administer. In my view, this is sufficient to rebut the majority's speculation about "practical problems."

Amendment 1A's requirement to apply strict scrutiny imposes a duty on our court to apply *actual* strict scrutiny, not a bloodless version of it. This is critical both because courts have a duty to honor the will of the people in demanding strict scrutiny for firearms restrictions (expressed in this case through successive legislative majorities and voters' own ballots) and because our application of strict scrutiny today reaches far beyond the immediate case. Strict scrutiny as a constitutional test performs a vital adjudicative function. Our application of it in challenges brought under Amendment 1A must not deviate from how we apply the standard in other contexts. To do otherwise "threaten[s] to degrade the meaning of strict scrutiny and thereby blunt that standard of review's ability to serve its historic purposes when deployed in other contexts." Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. 1455, 1481 (2019). ("[I]f a court waters down strict scrutiny's requirements in one setting, it thus threatens to water down those requirements in all of the other settings in which that standard applies.")

Separating the burdens of production and persuasion between parties is nothing new in our caselaw. Defendants in criminal cases generally bear the burden of production to advance affirmative defenses (self-defense, entrapment, etc.). For instance, in *State v. Bailey*, we noted that the defendant bore the burden of producing sufficient evidence to invoke a statutory defense to extortion. 2 N.W.3d at 435. The state bore no burden to negate the extortion defense until the defendant met his first. *Id.*; *see also* McCormick § 336, at 784 ("The burden of persuasion becomes a crucial factor only if the parties have

sustained their burdens of producing evidence and only when all of the evidence has been introduced.").

The district court, in its ruling, repeatedly remarked that N.S. bore the burden of proving that his right of possession should be restored. At the conclusion of its analysis, the district court wrote: "When considering all of the factors set out in Iowa Code § 724.31(3), and the quality of the evidence provided by [N.S.], the court is unable to determine whether [N.S.] 'will not be likely to act in a manner dangerous to the public safety' under Iowa Code § 724.31." The burden of persuasion imposed on N.S. appears to have weighed meaningfully in the district court's decision to deny his restoration petition.

I would vacate the district court's order denying relief under § 724.31 and remand the case for the district court to evaluate the evidence with the burden of persuasion properly imposed on the state.

Mansfield and May, JJ., join this dissent.