# IN THE COURT OF APPEALS OF IOWA

No. 16-2073
Filed January 10, 2018

**IN THE MATTER OF A.M.,**

**A.M.,**
　　　　Petitioner/Appellant.

_____

　　　　Appeal from the Iowa District Court for Bremer County, Christopher C. Foy, Judge.

　　　　A person previously involuntarily hospitalized for mental-health treatment seeks restoration of his firearm privileges. **AFFIRMED.**

　　　　Kevin D. Engels of Correll, Sheerer, Benson, Engels, Galles & Demro, P.L.C., Cedar Falls, for appellant.

　　　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

　　　　Heard by Vogel, P.J., and Tabor and Bower, JJ.

**TABOR, Judge.**

A.M. appeals the district court's refusal to restore his firearm rights under Iowa Code section 724.31 (2016). After reviewing the available record, we reach the same conclusion as the district court—A.M. did not present sufficient evidence to show he would not be likely to act in a manner dangerous to public safety. Accordingly, we affirm.

## I. Background Facts and Prior Proceedings

In 2010, then twenty-year-old A.M. was abusing alcohol; by his own account, he drank almost every day. He also suffered from depression starting in high school. And although A.M. was prescribed medication, he refused to take it.

After a night of heavy drinking[1] in March 2010, A.M. contacted Shane Hoff, who was a Bremer County Sheriff's Deputy and a family friend. A.M. was driving his brother's truck and asked Hoff to follow him home; Hoff, who was on patrol duty, refused two separate requests and told A.M. not to drive if he was drunk. But A.M. drove anyway and sideswiped a bridge with his brother's truck. A.M. again contacted Deputy Hoff and asked him to survey the damage to the truck. Hoff stopped by the home of A.M.'s mother to inspect the truck and talk to A.M.

After Deputy Hoff left, A.M. grew more distraught and decided to commit suicide with his mother's shotgun. Once A.M.'s mother awoke and realized her son's plans, they ended up struggling over the gun. A.M.'s thirteen-year-old sister helped by distracting A.M. so their mother could hide the gun. A.M. became enraged and assaulted his mother and sister, as well as a neighbor to whose house

---

[1] A.M. reported drinking twenty beers that evening, and his blood alcohol level was 0.171 when tested.

they ran for help. After responding to a 911 call, Deputy Hoff arrested A.M., who was charged with burglary and assault.[2] All three of A.M's assault victims required medical attention for their injuries.

As a result of the violent incident, A.M.'s mother initiated civil commitment proceedings, writing in the application under Iowa Code section 229.6 that this was "not the first time that [A.M.] has gotten this way with me or family members." Once at the hospital, A.M. didn't want to disclose why he was there and wouldn't take responsibility for his actions. Psychological testing confirmed A.M.'s problems with anger management and substance abuse. Specifically, the psychologist's March 7, 2010 report opined that A.M. was "at risk of ongoing problems with poor control over his aggressive impulses." A medical doctor reported A.M. "minimized any depressive symptoms" and assessed him as having "probable alcohol dependence versus abuse."

The hospital discharged A.M. to outpatient mental-health and substance-abuse treatment. He continued treatment for "a couple of months" after his discharge. He also completed substance abuse counseling as a requirement of his probation. A.M. took the medication prescribed to him for a few months after his discharge. When he believed he was better, he stopped taking the medication without consulting a doctor. A.M. also abstained from alcohol for a couple of years after his discharge fearing he wouldn't be able to handle himself if he resumed drinking. But he eventually returned to occasionally consuming alcohol.

---

[2] A.M. was convicted of burglary in the third degree, two counts of assault causing injury, and one count of simple assault. He received a deferred judgment on the felony burglary and served a jail sentence on the assault charges.

A.M. started a romantic relationship shortly after he was released from the hospital, and he married in 2013. The couple had a son in the spring of 2015. A.M. also opened his own full-time painting business.

As a result of his involuntary hospitalization, A.M. lost his firearm privileges in accordance with 18 U.S.C. § 922(d)(4) and (g)(4).[3] Wishing to someday teach his son to hunt, A.M. filed a petition to restore his privileges under Iowa Code section 724.31. As required by statute, the district court ordered a hearing on the matter in November 2016. *See* Iowa Code § 724.31(3) (requiring court to consider evidence in a closed proceeding). The provision also mandated the court receive evidence, offered by petitioner A.M., concerning all of the following:

> a. The circumstances surrounding the original issuance of the order or judgment that resulted in the firearm disabilities imposed by 18 U.S.C. § 922(d)(4) and (g)(4).
> b. The petitioner's record, which shall include, at a minimum, the petitioner's mental health records and criminal history records, if any.
> c. The petitioner's reputation, developed, at a minimum, through character witness statements, testimony, and other character evidence.
> d. Any changes in the petitioner's condition or circumstances since the issuance of the original order or judgment that are relevant to the relief sought.

*Id.*

A.M. provided his mental-health records from March 2010. A.M. also offered his criminal-history records showing only speeding tickets since the time of the burglary and assaults.

---

[3] The record does not show that A.M. is prohibited from possessing a firearm based on committing a misdemeanor crime of domestic violence. *See* Iowa Code § 724.26.

As far as his reputation, A.M. called his mother and Deputy Hoff as character witnesses. Deputy Hoff testified he had known A.M. for eleven years through A.M.'s family. He maintained a personal relationship with A.M.; they played on the same softball team. The deputy testified he thought about quitting his job because of the 2010 incident with A.M., believing it was "his fault" as an officer and friend, and that he "should have done more" to prevent A.M. from committing the assaults. But Deputy Hoff testified he didn't "have any fears of [A.M.] possessing or owning firearms."

A.M.'s mother testified she initiated the civil commitment process in 2010 because she wanted to get A.M. help for his drinking and did not believe he was likely to seek help on his own. She testified she now has a good relationship with A.M. and in the intervening years her son has become "a different person." She told the court she had no worries about A.M. having his firearm privileges reinstated. A.M. also testified in support of his petition.

Both the county attorney and an assistant attorney general, representing the Department of Human Services (DHS), appeared and questioned witnesses. After the hearing, the county attorney filed a statement in support of A.M.'s petition. The DHS did not join that statement. After considering the evidence, the district court denied A.M.'s petition reasoning "too little time" had passed since A.M.'s commitment and noting A.M.'s "only long-term change" is that he no longer drinks alcohol in excess.

A.M. filed a motion to amend, enlarge, or modify in light of the county attorney's statement of support. The district court denied the motion, noting it

considered the statement of support when reaching its conclusion. A.M. now appeals.

## II. Scope and Standard of Review

By statute, our review of the district court's denial of relief is de novo. Iowa Code § 724.31(4). Under a de novo review, "we make an independent evaluation of the totality of the circumstances as shown by the entire record." *State v. Howard*, 509 N.W.2d 764, 767 (Iowa 1993). But because the district court had the opportunity to observe the witnesses and evaluate their credibility firsthand, we give deference to its factual findings. *See State v. Fleming*, 790 N.W.2d 560, 563 (Iowa 2010); *see also In re E.C.*, No. MISC-107-89, 2015 WL 4112097, at *4 (N.J. Super. Ct. App. Div. July 8, 2015) (giving deference to trial court's factual assessments in appeal from refusal to expunge commitment record in effort to regain firearm privileges).

## III. Analysis

Federal law prohibits A.M. from possessing a firearm. *See* 18 U.S.C. § 922(g)(4) ("It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess any firearm or ammunition). Congress enacted this prohibition as part of the Gun Control Act of 1968. *See* Nash E. Gilmore, Note, *A Bridge Over Troubled Water: The Second Amendment Guarantee for the Previously Mentally Institutionalized*, 86 Miss. L.J. 1, 14–15 (2017) [hereinafter Gilmore].

From 1968 until 1992, people seeking restoration of their firearm privileges were required to apply for relief to the director of the Bureau of Alcohol, Tobacco, and Firearms (ATF) under 18 U.S.C. § 925(c). *Id.* at 15–16. Until 1986, only those

banned from possessing firearms due to certain felony convictions could seek restoration. *U.S. Dep't of Treasury v. Galito*, 477 U.S. 556, 558 (1986). Then Congress redrafted section 925(c) using broader language to permit people previously committed to a mental institution or classified as "a mental defective" to petition the ATF for restoration of their firearm privileges. *Id.* at 559. If the ATF director concluded a person "[would] not be likely to act in a manner dangerous to public safety and that granting of the relief would not be contrary to the public interest," then the person's firearm privileges would be reinstated. Gilmore, at 16.

Congress defunded the ATF program in 1992 making it functionally impossible to reinstate a person's firearm privileges under § 925(c). *See id.* Then "[i]n 2008, in the wake of the Virginia Tech shootings, Congress realized the importance of a well-maintained and accurate National Instant Check System (NICS)." *Id.* at 17. Congress authorized federal grants to help states provide more reliable records to the NICS. *See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110–180, §§ 103–105, 122 Stat. 2568–70, 2559 (2008). But as a condition of the grants, Congress required states to establish restoration methods similar to the defunded ATF program. *See* Gilmore at 17. As part of their relief programs, states must instruct reviewing courts to consider the applicant's record and reputation when making two determinations: (1) the person "will not be likely to act in a manner dangerous to public safety" and (2) "the granting of relief would not be contrary to the public interest." *See Franklin v. Lynch*, No. 3:16-cv-36, 2016 WL 6879265, at *3, *6 (W.D. Penn. Nov. 21, 2016). In January 2011, our legislature enacted Iowa Code section 724.31 in response to the federal

legislation.  *United States v. Johnson*, No. CR15-3035-MWB, 2016 WL 212366, at

*5 (N.D. Iowa Jan. 19, 2016).  We have no case law interpreting section 724.31.

### A.    A.M.'s Petition for Restoration of Firearm Privileges

Section 724.31(3) required the district court to consider evidence offered by

A.M. in four categories: (1) the circumstances of the incident resulting in his loss

of firearm privileges; (2) A.M.'s mental health and criminal history records; (3) his

reputation, developed, at a minimum, through character witness statements or

testimony; and (4) any changes in A.M.'s condition or circumstances since his

involuntary hospitalization relevant to restoring his firearm privileges.  If, after

considering such information, the court finds, by a preponderance of the evidence,

A.M. "will not be likely to act in a manner dangerous to the public safety and that

the granting of the relief would not be contrary to the public interest," then the court

must grant relief.  *See* Iowa Code § 724.31(4).[4]

Here, the district court did not find that A.M. met his burden.  In our de novo

review, we will examine the quality of the evidence offered by A.M. in each

category and decide for ourselves whether it satisfies the public-safety and public-

interest tests for restoration of his firearm privileges.

We start with the circumstances of the March 2010 incident.  Significantly,

the violent event giving rise to A.M.'s involuntary hospitalization involved a

---

[4] The Iowa Code does not define either of these standards, likely because Congress conditioned federal funding on the inclusion of this language and our legislature simply adopted it.  *See Franklin*, 2016 WL 6879265, at *3, *6.  We read the public-safety prong as akin to Iowa's danger-to-self-or-others standard for serious mental impairment.  *See In re J.P.*, 574 N.W.2d 340, 343 (Iowa 1998) (citing definition in Iowa Code section 229.1).  We read the public-interest prong "to reach concerns other than 'public safety.'  Otherwise, the 'not contrary to the public interest' provision would be surplusage."  *See In E.C.*, 2015 WL 4112097, at *7.

shotgun, the same type of firearm A.M. wishes to obtain for hunting purposes. Because A.M.'s hospitalization followed his desperate efforts to acquire his mother's shotgun when he was feeling suicidal and because he was willing to assault others to achieve his goal, we are more reluctant to find A.M. has shown he "will not be likely to act in a manner dangerous to the public safety." *See id.* § 724.31(3)(a) (requiring courts to consider "circumstances surrounding the original issuance of the order" that resulted in the firearm disability); *see also Nickel v. Melson*, 825 F. Supp. 2d 187, 192–93 (D.D.C. 2011) (noting underlying offense involving explosives weighed against reinstatement of privilege to possess explosives); *In re Mulioli*, Misc. No. 93-MC-249, 1994 WL 80822, at *1 (E.D. Pa. Mar. 7, 1994) (considering underlying offense giving rise to firearm prohibition involved a firearm when refusing restoration of firearms privilege). The circumstances of the original incident were serious and exposed volatility in A.M.'s behavior that was exacerbated by his mental-health struggles and alcohol dependence.

Which brings us to the second category—A.M.'s mental health and criminal records. On the criminal side, A.M. satisfied the terms of his probation for the deferred judgment including substance-abuse counseling. And other than traffic tickets, A.M. had been a law-abiding citizen for the past six plus years. On the issue of his mental health and alcohol dependence, we have less up-to-date information. A.M. successfully discharged from his outpatient treatment program following his involuntary hospitalization in 2010. But A.M. did not explain what constituted a successful discharge or what insights he gained from counseling. Without these details, we do not know if his completion of the outpatient program

and counseling addressed long-term issues or immediate problems. We also don't know if additional treatment or counseling was recommended.

The district court noted A.M. "has not received any mental health treatment or counseling since his involuntary hospitalization was closed." The court acknowledged A.M. may not need "any outside help to avoid a repeat of what happened in March 2010" but concluded "without more of a track record, the court questions whether a string of bad luck or an unfortunate combination of stressors and difficulties still might lead [A.M.] to 'snap' and engage in conduct that caused him and his family problems back in March 2010." We give deference to the district court's hesitation.

A.M. provided his psychological and medical reports from 2010 only. We have no mental health records or assessments from the intervening six years. A recent evaluation would have assisted the district court in deciding if A.M. required any long-term counseling or treatment and if he could be trusted with a firearm. In addition, A.M.'s own testimony raised concerns. When A.M. was discharged, he was still taking antidepressants. But he chose to stop doing so without consulting a physician. A.M. did not present testimony from a physician or therapist approving his decision to stop the medication or indicating A.M. would not benefit from the medication now. While we do not suggest a person seeking restoration of firearm privileges would always need testimony from a health professional, the statute does require "at a minimum" the presentation of the petitioner's mental-health records. Given A.M.'s unilateral decision to stop taking his prescribed medication, we believe additional evidence would have been helpful in meeting his burden of proof.

A.M.'s testimony also raised doubts about his attention to the alcohol dependence identified in his 2010 records. Despite his uncertainty whether he could handle the effects of alcohol, A.M. admitted he no longer abstains from alcoholic beverages and uses his brother as a chaperone when he drinks. A.M. testified he consumes alcohol on "rare occasions" but doesn't drink "more than one or two drinks" at a time. More troubling is that both of his character witnesses, his mother and Deputy Hoff, testified A.M. no longer drank. Their testimony suggests A.M. has not been forthright about his decision to drink on occasion. In fact, Deputy Hoff specifically testified he asked A.M.'s brother if A.M. still drank and the brother denied it. Further, as the district court highlighted, A.M. "is not involved in AA or any other kind of support group." The record left lingering questions about the danger of A.M. falling back into substance abuse.

As for the third category, A.M. presented evidence he has cultivated a positive standing in the community. He is actively involved in a local softball league. His business has a good reputation, and clients trust him. He is a responsible father. These facts indicate A.M. is able to respond appropriately in a variety of situations. Our only hesitation here is the reputation evidence was predictably one-sided. A.M.'s character witnesses were not neutral, disinterested parties. Our consideration of Deputy Hoff's testimony must include his personal association with A.M. and A.M.'s family. Although A.M. presented Deputy Hoff as the responding officer the night of the incident, Deputy Hoff also has a decade-long relationship with A.M. Deputy Hoff questioned his own response to A.M.'s crisis and indicated he felt responsible for the incident getting out of control. Given

Deputy Hoff's affection toward A.M. and expressed concerns that he is to blame for A.M.'s conduct, his testimony cannot be taken as wholly objective.

Similarly, while the testimony of A.M.'s mother offered a glowing picture of her son's progress, her views cannot be held up as unbiased. We recognize A.M.'s mother was one of his victims in 2010 and her application led to his involuntary hospitalization. But any mother's support for her child can naturally color her objectivity. *See generally Wiseman v. Cornish*, 53 N.C. (8 Jones) 218, 219–20 (1860) (recognizing "[t]here is no rule of law, that the relation of mother to the party 'naturally gives a bias to her statements'" but leaving consideration to the fact finder).

Because the only witnesses called by A.M. to testify were close to him and may not have been objective, the court's ability to "conduct a systematic inquiry" into the wisdom of restoring A.M.'s firearm privileges was significantly hampered. *See Mullis v. United States*, 230 F.3d 215, 219–20 (6th Cir. 2000) ("Unlike the ATF, the court cannot canvas the circle of neighbors and acquaintances who may have negative information concerning such things as the applicant's tendency toward violence or use of drugs and alcohol.").[5] Relying on the same record on appeal, our ability to assess A.M.'s reputation and character is likewise limited.

---

[5] The Sixth Circuit quoted a congressional appropriations committee report explaining why it withheld funds for ATF investigations: "After ATF agents spend many hours investigating a particular applicant[,] they must determine whether or not that applicant is still a danger to public safety. This is a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made." *Mullis*, 230 F.3d at 220 (citing S. Rep. No. 353, 102nd Cong., 2d Sess. 77 (1992)). The report opined that money would be better used to "crack down on violent crime."

Looking to the fourth category of evidence, the record suggests A.M.'s circumstances have changed for the better since his hospitalization in 2010. In those six plus years, he married, started a family, and launched a business. According to the available record, A.M. has weathered these life stressors without any tumult. His criminal history is limited to traffic violations. Still, the district court was somewhat circumspect about A.M.'s progress, identifying A.M.'s "only long-term change" as no longer drinking alcohol to excess.

This case presents a close call. A.M. has shown personal growth and stability since his hospitalization more than six years ago. But we give due deference to the trial court's ability to see and hear A.M. and his character witnesses. The district court signaled it did not believe A.M. had paid sufficient attention to his mental-health and substance-abuse issues. The district court hoped to see "more of a track record" to establish it would not be dangerous to restore A.M.'s firearm privileges. After our de novo review of the record, we also conclude A.M. has not met the first requirement of Iowa Code section 724.31(4).

Because we conclude A.M.'s evidence fell short of showing he will not be likely to act in a manner dangerous to the public safety, we need not determine if restoring his firearm privileges would be contrary to public interest.[6] *See* Iowa Code § 724.31(4).

### B. Impact of County Prosecutor's Statement of Support

---

[6] The public-interest prong has been called "an amorphous standard." *Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 224–25 (3d Cir. 2002). The United States Supreme Court suggested this requirement calls for policy-based decisions but did not explain what policies would be implicated. *See United States v. Bean*, 537 U.S. 71, 77 (2002).

A.M. claims the county attorney's statement of support is analogous to reaching a settlement agreement and the district court improperly disregarded it. He argues if all parties are in agreement, why refuse the remedy all parties seek? But A.M.'s argument has two critical flaws. First, the statement of support only indicated the county attorney favored restoration.[7] The legislature anticipated both the county attorney and the DHS may appear at the hearing and offer support for or objection to restoration of the firearm privileges. Iowa Code § 724.31(2). Both appeared here. But the assistant attorney general, appearing on behalf of DHS, did not support the restoration. Second, even if the State's position had been monolithic, ultimately, the district court was required to consider the evidence and make findings. *See* Iowa Code § 724.31(3), (4); *see also In E.C.*, 2015 WL 4112097, at *9 ("As this case demonstrates, petitions for relief may be unopposed. The court therefore assumes a critical role in scrutinizing an application to assure it meets the statutory requisites."). If the district court rubber-stamped an agreement between A.M. and the State, it would run afoul of the statutory intent requiring the court to base its ruling on evidence rather than an agreement.

## IV. Conclusion

A.M. did not offer the quality of evidence necessary to establish he will not be likely to act in a manner dangerous to the public safety. The current denial of relief does not foreclose all opportunities to restore A.M.'s firearm privileges.

---

[7] The statement of support reads: "After full consideration of the testimony and exhibits presented at hearing on November 7th, 2016, being duly held to direct and cross-examination, the county attorney, pursuant to Iowa Code section 724.31(2), supports the relief sought by the petitioner."

Should A.M. wish to file another petition, he may do so in two years. *See* Iowa Code § 724.31(4).

**AFFIRMED.**