# In the Iowa Supreme Court

No. 24–0297

Submitted December 17, 2024—Filed February 21, 2025

**In the Interest of N.F.**

**State of Iowa,**

Appellant.

Appeal from the Iowa District Court for Monona County, Jeffrey A. Neary, judge.

The State appeals from an order restoring firearm rights. **Affirmed.**

May, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General; Patrick C. Valencia (argued), Deputy Solicitor General; and Sarah Jennings, Assistant Attorney General, for appellant.

Alan R. Ostergren (argued) of Alan R. Ostergren, PC, Des Moines, for appellee.

**May, Justice.**

In 2016, a fourteen-year-old boy was involuntarily committed. This disqualified him from possessing firearms.

Eight years later, the boy—now an adult—petitioned the district court to restore his firearm rights under Iowa Code section 724.31 (2023). This statute requires the court to restore firearm rights if the petitioner submits certain evidence and, ultimately, persuades the court "that the petitioner will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." Iowa Code § 724.31(4).

The district court found that these requirements were met. So the court entered an order restoring the petitioner's firearm rights. The State now appeals from that order. But the petitioner asks us to dismiss because the state has no right to appeal.

So we are faced with two questions. First, we must decide whether the state has a right to appeal from restorations under section 724.31. We conclude that it does. So we deny the petitioner's motion to dismiss the appeal.

Next, we must decide whether section 724.31's restoration requirements have been met. We conclude that they have been. So we affirm the district court's restoration order.

**I. Factual and Procedural Background.**

**A. Early Life.** This case is about N.F., whom we refer to as Nathan (not his real name). Nathan was born in 2001. For the next thirteen years, he lived with his mom and dad and younger siblings. Nathan was "very close" to his dad and considered him to be his best friend. Nathan feels like he had a normal family and everyone "got along very well."

But then things got worse. In 2015, Nathan's parents divorced. His dad moved to Montana and left behind Nathan, his mom, and his younger siblings. The divorce stressed his mom and strained his home life. His mom experienced "medical episodes" that might have involved a drug problem. These episodes caused periods of unconsciousness. During these episodes, Nathan—who was now between the ages of thirteen and fourteen—took care of himself and his siblings. Nathan's dad tried to come back and work things out with Nathan's mom. But it was "back and forth."

**B. Trouble.** Confused and upset, Nathan acted out. He got into fights at school. He drank with his older high school friends. He left home for days at a time. He sometimes stayed at the house of Jeff (not his real name), an old co-worker of Nathan's dad and a longtime family friend. Jeff is a retired law enforcement officer who now works as a registered nurse.

Nathan also got into arguments with his mom. His dad served as the intermediary. Contrary to his parents' assertions, however, Nathan denies any violence toward his parents or siblings.

**C. Legal Involvement.** Nathan's troubles came to a head in 2016. Between March and June, Nathan was involuntarily detained three times.

1. *The first matter.* On March 12, police brought Nathan to a local hospital at his parents' requests. According to nursing notes, his parents said that Nathan had been using tobacco and alcohol, breaking rules, and running away. His parents also reported that he had stated several times that he "wanted to put a bullet to his head and he would be better off dead." Around this time, Nathan was prescribed antidepressants.

That same night, a magistrate signed an order for a forty-eight-hour hold at a hospital for the recovery of children and adolescents ("recovery hospital").

Nathan was discharged on an outpatient basis. He soon ran away from home again.

2. *A pair of subsequent matters.* About two weeks later, on March 23, Nathan's dad submitted applications asking for Nathan to be taken into custody again. One of the applications alleged serious mental impairment and the other alleged chronic substance abuse. *See* Iowa Code § 229.6 (serious mental impairment); *id.* § 125.75 (substance-related disorder). As support, Nathan's dad noted behaviors like running away, drinking alcohol, destroying property, skipping school "and sports practice," and being "addicted to chewing tobacco and social media," namely "Facebook and Snap Chat." His dad also alleged that Nathan "requests he be beaten during altercations and talks of suicide when with friends." Also, his dad claimed that Nathan "terrorizes small brother (11) and sister (7) when at home." Nathan's mom noted similar behaviors in her supporting affidavits.

In response to the applications, two court files were opened: one for a mental impairment case under chapter 229 and the other for a substance abuse case under chapter 125. Although separate files were opened, the two matters were litigated together. This parallel treatment started when the court entered initial orders in both matters. These orders placed Nathan at the recovery hospital until a hearing could be held on March 29. The court also entered orders (again, in both actions) appointing a physician to examine Nathan.

On March 28, the physician provided the court with a report diagnosing Nathan with "oppositional defiant disorder; post-traumatic stress disorder; major depressive disorder, single episode severe without psychosis; alcohol use disorder, moderate." The physician opined that Nathan's issues were treatable

with medication and therapy. But because of Nathan's history of running away, the physician recommended full-time residential treatment.

On March 29, the court held a contested hearing on both matters. Following the hearing, the court ordered Nathan placed at the recovery hospital for further evaluation and treatment. The court also ordered the recovery hospital's chief medical officer to submit a periodic report within thirty days. And the court set a review hearing for April 28.

On April 27, the court sent a reminder order to the parties and the recovery hospital. The order noted that no progress report had been filed by the chief medical officer.

Later that day, a progress report was filed in both cases. The progress report was signed by a social worker. The report said that Nathan "was in the contemplation stage of change" but was still struggling to address his substance abuse issues with alcohol and chewing tobacco.

The review hearing was held on April 28. The social worker's progress report was the only evidence offered. During the hearing, Nathan's attorney moved to dismiss the mental health proceeding because the progress report related "to substance abuse, not mental illness" and because the report was "not authored by the required medical practitioner." The court agreed and dismissed the mental health proceeding.

During the same hearing, Nathan's attorney also moved to dismiss the substance abuse matter because the progress report "was not authored by a level of medical professional required by Iowa Code Section 125.86(1) and did not comply with" the court's prior orders, which had specified that the report must be provided by the chief medical officer. The court responded by advising the parties that the matter would be dismissed unless a compliant progress report

was filed by 4:30 p.m. Ultimately, the court dismissed the case. This note appears at the end of the dismissal order:

> Note: A Psychiatric Progress Report was filed in this case several hours after the hearing. That report is authored by a physician, but it . . . *does not make any recommendation that the child remain in an inpatient facility* . . . .

(Emphasis added.)

With both cases dismissed, Nathan was released.

3. *The final matter.* After his release, Nathan tried staying at home. But he left after only a week. He stayed with his older sister until she kicked him out because of behavioral issues. He then stayed with different friends.

On June 24, his parents brought him to a hospital. According to physician notes, Nathan's parents reported that he had told a counselor at the recovery hospital that "he was going to go out with a bang." They also reported that Nathan "told another individual that he was going to kill a guy that was sleeping with his [girlfriend]." Nathan admitted using nicotine and alcohol. He also reported he could not be at home because of the dynamics with his parents. And he reported not taking his antidepressants for a week.

Although his parents wanted Nathan admitted for psychiatric care, Nathan was "not willing" to be admitted. But a magistrate ordered another forty-eight-hour hold. This order was signed on the night of June 24.

**D. Transitional Period.** After the magistrate's order, Nathan was not involuntarily detained again. During his testimony at the restoration hearing, however, Nathan volunteered that his mom had sent him to a residential shelter for adolescents and then later to a second shelter, both on a voluntary basis. Meanwhile, the Iowa Department of Human Services visited Nathan and his mom and evaluated the integrity of their household.

**E. Stability.** Following Nathan's stay at the second shelter, Jeff asked Nathan to live with him, his wife Rose (not her real name), and their family. After Nathan lived with them for several months, Jeff and Rose applied for and received guardianship of Nathan in 2017.

Things continued to go well. Nathan now considers Jeff and Rose to be his mom and dad. With their support, Nathan overcame his troubled path. Because of Jeff and Rose, Nathan finally felt (in his words) "happy, grateful, and cared for." As a result, Nathan made better choices. He stopped drinking and improved in school. He even earned a college degree.

Today, Nathan works at a hospital and lives with a roommate. He reports no ongoing physical, mental, or emotional disability. Since Jeff and Rose became his guardians in 2017, Nathan has not been on psychiatric medication and has not received any mental, emotional, or substance abuse treatment.

**F. This Action.** In August 2023, Nathan filed a petition for relief from a firearms disability pursuant to Iowa Code section 724.31. In January 2024, the district court held a contested hearing. Nathan represented himself. An Assistant Attorney General represented the Iowa Department of Health and Human Services (HHS). The district court granted Nathan's petition. HHS moved to reconsider, but the court declined. This appeal by the State followed.

**II. Jurisdiction.**

Before we can reach the merits of the State's appeal, we must consider whether we have jurisdiction. Nathan has raised this issue through a motion to dismiss. He argues that although *a petitioner* may appeal a *denial* of relief under Iowa Code section 724.31, the state has no right to appeal a *grant* of relief. We disagree.

**A. First Principles.** "[T]he right of appeal is not an inherent or constitutional right; it is a purely statutory right that may be granted or denied by the legislature as it determines." *James v. State*, 479 N.W.2d 287, 290 (Iowa 1991); *see also In re Durant Cmty. Sch. Dist.*, 106 N.W.2d 670, 676 (Iowa 1960) ("We have repeatedly held the right of appeal is a creature of statute. It was unknown at common law."); *Van Der Burg v. Bailey*, 223 N.W. 515, 516 (Iowa 1929) ("The Legislature may give or take it away at its pleasure."). Unless an appeal is authorized by statute, we lack jurisdiction, and we must dismiss the appeal. *Ontjes v. McNider*, 275 N.W. 328, 339 (Iowa 1937).

Through the enactment of two statutes—Iowa Code sections 602.4201 and 602.4202—the legislature authorized our court to make rules governing the right of appeal, although that authority is "subject to the rulemaking procedures" delineated in the statutes. *Butler v. Woodbury County*, 547 N.W.2d 17, 20 (Iowa Ct. App. 1996). We followed those procedures when we adopted Iowa Rule of Appellate Procedure 6.103, the general rule governing appeals of final orders and judgments. Like other rules made in this fashion, rule 6.103 has the "force and effect of statute." *Hubbard v. Marsh*, 32 N.W.2d 67, 68 (Iowa 1948). And so, generally speaking, rule 6.103 governs whether we have appellate jurisdiction of appeals of final orders and judgments of the district court. *See, e.g., In re Dethmers Mfg. Co.*, 985 N.W.2d 806, 813 (Iowa 2023); *State v. Propps*, 897 N.W.2d 91, 96 (Iowa 2017).

**B. Application.** With this background, we apply rule 6.103 to see whether we have jurisdiction here. Like other rules, we interpret rule 6.103 "in the same manner we interpret statutes." *State v. Mootz*, 808 N.W.2d 207, 221 (Iowa 2012) (quoting *City of Sioux City v. Freese*, 611 N.W.2d 777, 779 (Iowa 2000) (en banc) (per curiam)); *see, e.g., Ronnfeldt v. Shelby Cnty. Chris A. Myrtue Mem'l Hosp.*,

984 N.W.2d 418, 421–26 (Iowa 2023) (harmonizing the application of Iowa Rule of Civil Procedure 1.943 with Iowa Code section 147.140 (2021)); *State v. Tucker*, 982 N.W.2d 645, 653–55 (Iowa 2022) (applying Iowa Rule of Criminal Procedure 2.14); *Mootz*, 808 N.W.2d at 220–21 (applying Iowa Rule of Criminal Procedure 2.18). When a rule's wording is plain, we give effect to that "plain wording." *Hubbard*, 32 N.W.2d at 68. Here are the words of the rule:

> All final orders and judgments of the district court involving the merits or materially affecting the final decision of the case may be appealed to the supreme court, except as provided in this rule, rule 6.105, and Iowa Code sections 814.5 and 814.6.

Iowa R. App. P. 6.103(1) (2023).

Applying the rule's plain wording, we believe rule 6.103(1) provides jurisdiction for the State's appeal. Three reasons support this view. First, it seems clear that this appeal was taken from the sort of final order contemplated by rule 6.103(1). "An order is 'final' if it 'conclusively adjudicates all of the rights of the parties' and leaves the district court with 'nothing more to do than execute [the] order.'" *Dethmers Mfg. Co.*, 985 N.W.2d at 813 (first quoting *Richers v. Marsh & McLennan Grp. Assocs.*, 459 N.W.2d 478, 480 (Iowa 1990); and then quoting *In re M & S Grading, Inc.*, 526 F.3d 363, 369 (8th Cir. 2008)). That describes the restoration order. It resolved the only issue in the case: Should Nathan's rights be restored? And once the order was entered, there was nothing more for the district court to do except publish it in the manner required by Iowa Code section 724.31(5). So it was a "final order."

Next, we note that although rule 6.103(1) lists four exceptions, none of them apply here.

- Although the appeal right granted in rule 6.103(1) is subject to the condition "except as provided in this rule," we find nothing in rule 6.103 that might prohibit the State's appeal here.

- Although rule 6.103(1) excludes matters covered by "rule 6.105," rule 6.105 applies only to small claims actions.

- Although rule 6.103(1) excludes matters covered by "Iowa Code section[] 814.5," that section only applies to appeals by the state in criminal cases.

- Although 6.103(1) excludes matters covered by "Iowa Code . . . section[] 814.6," that section only applies to appeals by defendants in criminal cases.

Iowa R. App. P. 6.103(1). In short, none of the four exceptions are relevant. So the general right to appeal applies.

Finally, we note that the text of rule 6.103(1) imposes no limits on *who* may appeal. The rule's passive language ("[a]ll final orders . . . may be appealed") suggests the appeal right is available to any losing party. *Id.* Because the State lost in its effort to resist Nathan's petition, rule 6.103(1) permits the State to appeal.

**C. Counterarguments.** We have considered Nathan's counterarguments about section 724.31. Nathan draws our attention to subsection four, which states in relevant part: "The petitioner may appeal a denial of the requested relief, and review on appeal shall be de novo." Iowa Code § 724.31(4). Nathan argues that because subsection four expressly recognizes the right of an aggrieved petitioner to appeal a denial of relief but does not mention any corresponding right for the state, then we must infer that the state has no right to appeal.

We disagree. As explained, rule 6.103(1) provides a general appeal right that—on its face—applies to any losing party. And although rule 6.103(1) identifies four specific exceptions—two of which call out specific sections of the Code—none of those exceptions mention section 724.31 actions. The natural inference is that section 724.31 actions are not excepted from rule 6.103(1)'s broad appeal right for losing parties, including the state.

We also recall our duty to harmonize rules and statutes whenever we can. A good example is *In re Detention of Pierce*, 748 N.W.2d 509 (Iowa 2008). *Pierce* involved a statute that governs commitments of individuals who are sexually violent predators (SVPs). *Id.* at 511–12. Although the statute provides a right *for an individual* to appeal a determination that he or she *is* an SVP, the statute does *not* expressly provide *the state* with a right to appeal a contrary determination. *Id.* at 512; *see* Iowa Code § 229A.7(5)(*b*). In *Pierce*—as here—the question was whether that sort of statutory language precluded the state from appealing. *See Pierce*, 748 N.W.2d at 511. We concluded that it did not because the general appeal right codified in rule 6.103(1) (then rule 6.1) could be "harmonized" with the SVP statute's appeal language. *Id.* at 512. We found that the appeal language in the SVP statute was "merely an effort by the legislature to emphasize the respondent's right to appeal an SVP determination." *Id.* It was not an attempt "to eliminate the State's general right to appeal" under rule 6.103(1). *Id.*

We reach the same conclusion here. As in *Pierce*, we do not think the legislature intended to eliminate the state's general right to appeal under rule 6.103(1). *See id.* Rather, as in *Pierce*, we think the legislature simply wished to emphasize that the petitioner may appeal. *See id.*

Emphasis of this kind makes sense because, as we've mentioned before, federal funding was a significant driver behind section 724.31(4)'s wording.

Congress offered funding to the states, but only if they established firearm-disability-relief programs that met specific conditions. *In re N.S.*, 13 N.W.3d 811, 834 (Iowa 2024) (discussing 34 U.S.C. § 40915). One of those conditions was that the program had to "permit[] *a person whose application for the relief is denied* to file a petition with the State court of appropriate jurisdiction *for a de novo judicial review of the denial*." 34 U.S.C. § 40915(a)(3) (emphasis added). Iowa Code section 724.31(4) satisfied this condition by providing that "[t]he petitioner may appeal a denial of the requested relief, and review on appeal shall be de novo." Thus section 724.31(4) matches the federal requirement almost verbatim.[1] So we think its wording is best understood as a federal compliance effort, not an attempt to strip the state of its normal appeal right. *In re A.M.*, 908 N.W.2d 280, 284 n.4 (Iowa Ct. App. 2018) ("Congress conditioned

---

[1]Iowa is not alone on this path. Of the thirty-two other states that have a qualifying relief-from-firearm-disabilities program, twenty states have statutes that include language nearly identical to the federal language. U.S. Dep't of Just., Bureau of Alcohol, Tobacco, Firearms and Explosives, *NICS Improvement Amendments Act of 2007* (2021), https://www.atf.gov/firearms/docs/guide/nicsactlist7-7-210pdf/download [https://perma.cc/X747-XN8R]; Ala. Code § 22-52-10.8(b) (2024); Del. Code Ann. tit. 11, § 1448A(l)(6) (West 2024); Fla. Stat. Ann. § 790.065(2)(a) (West 2024); Haw. Rev. Stat. Ann. § 134-6.5(h) (West 2024); Idaho Code Ann. § 66-356(2) (West 2024); 430 Ill. Comp. Stat. Ann. 65/10(f), 65/11(b) (West 2024); Ind. Code Ann. §§ 33-23-15-2(d), -15-3(a), (b) (West 2024); Kan. Stat. Ann. § 75-7c27(f) (West 2024); Ky. Rev. Stat. Ann. § 237.108(2) (West 2024); Mass. Gen. Laws Ann. ch. 123, § 36C(d) (West 2024); Mo. Ann. Stat. § 571.092(9) (West 2024); Neb. Rev. Stat. Ann. § 71-963(4) (West 2024); N.Y. Mental Hyg. Law §§ 7.09(j), 13.09(g) (McKinney 2024); Okla. Stat. Ann. tit. 21, § 1290.27(F) (West 2024); Or. Rev. Stat. Ann. § 166.273(8) (West 2024); S.C. Code Ann. § 23-31-1030(H) (2024); Tenn. Code Ann. § 16-10-205(f) (West 2024); Utah Code Ann. § 76-10-532(10) (West 2024); Va. Code Ann. § 18:2-308.1:3(B) (West 2024); W. Va. Code Ann. § 61-7A-5(e) (West 2024). Others simply suggest the decision may be appealed. *See, e.g.*, La. Stat. Ann. § 28:57(G) (2024); N.M. Stat. Ann. § 34-9-19(G) (West 2024); N.C. Gen. Stat. Ann. § 14-409.42(c) (West 2024); N.D. Cent. Code Ann. § 62.1-02-01.2(4) (West 2024); *see also* Guam Sup. Ct. L.R. MR 7.1(h) (2023). Some do not explicitly address appealability. *See, e.g.*, Nev. Rev. Stat. Ann. § 179A.163 (West 2024); N.J. Stat. Ann. §§ 30:4-80.8 to -80.11 (West 2024); 18 Pa. Stat. and Cons. Stat. § 6105(f) (West 2024); Tex. Health & Safety Code Ann. § 574.088 (West 2024); Wis. Stat. Ann. § 51.20(13)(cv) (West 2024). And at least three statutes permit an appeal from a decision granting or denying the restoration petition. Alaska Stat. Ann. § 47.30.851(d) (West 2024); Ariz. Rev. Stat. Ann. §§ 12-2101(A)(5), 13-925 (2024); Md. Code Ann., Pub. Safety § 5-133.3(g) (West 2024) (cross-referencing a section that permits appeal by an aggrieved party).

federal funding on the inclusion of this language and our legislature simply adopted it.").

Finally, we note that the proceedings below were certainly adversarial. They were adversarial because Nathan asked the court for one thing (restoration), but the State asked for the opposite (denial of restoration). This adversarial posture reinforces our conclusion that either side should be allowed to appeal. As we recently mentioned in the context of parental terminations: "When litigants are adverse, we do not ordinarily limit the right to appeal to one adversary and not the other. Why limit an advocate to the early innings and deny a role in the later innings that can change the outcome?" *In re C.Z.*, 956 N.W.2d 113, 121 (Iowa 2021).

Of course, in a different context, the answer to that question might well be: "Because the legislature said so." In the present context, however, the legislature has not expressed an intent to eliminate the state's general right of appeal provided by rule 6.103(1). *Cf. Pierce*, 748 N.W.2d at 512. So we give effect to that right and deny Nathan's motion to dismiss.

**III. Merits.**

**A. Standard of Review.** With that jurisdictional question resolved, we turn to the merits. We start with a question about the proper standard of review. Although Iowa Code section 724.31, subsection four specifies that de novo review applies to appeals by petitioners, it is silent concerning appeals by the state (as discussed in part II). Iowa Code § 724.31(4). From this silence, Nathan infers that *if* the state has a right to appeal (something Nathan denies), the proper standard of review is correction of errors at law. Meanwhile, the State argues that the de novo standard mentioned in subsection four should apply to all appeals, including its own.

We assume without deciding that de novo review applies to the State's appeal. We need not decide this issue because we believe Nathan would prevail under either standard. *See, e.g., State v. Ary*, 877 N.W.2d 686, 699 (Iowa 2016) ("Because we conclude we would reach the same conclusion applying either standard of review, we need not decide which standard applies.").

Because we assume de novo review is appropriate, we conduct "an independent evaluation of the totality of the circumstances as shown by the entire record." *N.S.*, 13 N.W.3d at 820 (quoting *A.M.*, 908 N.W.2d at 283). "But because the district court had the opportunity to observe the witnesses and evaluate their credibility firsthand, we give deference to its factual findings." *Id.* (quoting *A.M.*, 908 N.W.2d at 283).

**B. Analysis.** We now turn to our merits analysis, starting with the governing law. Iowa Code section 724.31 requires the district court to grant a petition for relief from a firearms disability if the petitioner has proven by a "preponderance of the evidence that the petitioner will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." Iowa Code § 724.31(4); *see also N.S.*, 13 N.W.3d at 822 (discussing the petitioner's burden of proof under Iowa Code section 724.31(4) (2022)). In making this determination, the court must "receive and consider evidence in a closed proceeding" concerning four issues:

> *a.* The circumstances surrounding the original issuance of the order or judgment that resulted in the firearm disabilities imposed by 18 U.S.C. § 922(d)(4) and (g)(4).

> *b.* The petitioner's record, which shall include, at a minimum, the petitioner's mental health records and criminal history records, if any.

> *c.* The petitioner's reputation, developed, at a minimum, through character witness statements, testimony, and other character evidence.

> *d.* Any changes in the petitioner's condition or circumstances since the issuance of the original order or judgment that are relevant to the relief sought.

Iowa Code § 724.31(3).

Here, the district court concluded that Nathan met his burden and that relief should be granted. Based on our de novo review of the record as a whole, giving appropriate deference to the district court's factual findings, we reach the same conclusion.

As part of our review, we have considered each of the four areas of proof mandated in section 724.31. We discuss them in turn.

1. *Circumstances resulting in disability.* We start with paragraph *a*, which "directs us to consider the circumstances that led to [the] firearm prohibition." *N.S.,* 13 N.W.3d at 824. In our de novo review, we note that during a three-month period when Nathan was fourteen years old, he was twice subject to emergency holds and once subject to a month-long hospitalization. These detainments were initiated by Nathan's parents because of concerns about certain behaviors mentioned in part I. Although some of those behaviors seem relatively benign (addiction to social media and skipping sports practice), others raised justifiable concerns, including Nathan's alcohol abuse, physical violence at school, and statements about suicide and killing others.

For the sake of perspective, though, we note that this record *does not* reflect certain behaviors that courts have found especially disturbing. For instance, unlike in the court of appeals *In re A.M.* case, this record doesn't show any actual suicide attempts by Nathan. *See* 908 N.W.2d at 285. Nor does the record show any violence involving firearms. Indeed, there is no record of any weapon-related violence at all.

We also find that Nathan's troubles as a fourteen-year-old are best understood as situational and temporary. They occurred in the midst of the disintegration of Nathan's family. This context is important because *things changed* once Nathan found a stable home. We adopt the district court's finding that going to live with Jeff and Rose was "the stabilizing factor in [Nathan]'s life that he needed at the time." Likewise, we adopt the finding that "*after that,*" Nathan "has [had] no other hospitalizations" and "no issues with behavior or mental health." (Emphasis added.)

In short, although we understand how Nathan's 2016 problems led to court involvement, when we consider those problems in their proper context, they do not cause us to question the district court's decision to restore Nathan's rights.

2. *Mental health and criminal records.* Next we turn to paragraph *b*, which directs us to consider Nathan's mental health and criminal records. We start with the criminal records, which are quite limited. Nathan provided the district court with a criminal history record prepared by the Iowa Division of Criminal Investigation. It shows no Iowa criminal history for Nathan. And in his testimony, Nathan also confirmed his lack of criminal history.

Moving on to Nathan's mental health records, we have considered the records contained in the four court files from mid-2016, which we discussed in part I.C. As explained, though, we adopt the district court's finding that Nathan's juvenile mental health issues were transitory. They largely resolved through stabilization of his home life.

These findings are supported by the record as a whole. For instance, we note that after Nathan filed his petition for relief, HHS sent him a questionnaire. HHS stated that it was authorized to take a position on Nathan's petition and,

as a matter of "due diligence," wanted more information from him before doing so. Nathan complied. And his completed questionnaire is in our record. In it, Nathan reported that he had "no mental health or substance use treatment history in the past five years"—the time frame specified by HHS in its questionnaire. Nathan went on to explain that he was "not under the care of a healthcare provider or professional for mental health or substance use issues" and was "currently not on any medications for mental health or substance abuse use." And Nathan denied having any current "abuse issues, including alcohol or illegal substances."

Nathan's representations on the questionnaire were confirmed in his testimony. Nathan testified that he does not have "any sort of ongoing disability," be it physical, mental, or emotional. And he testified that he has not had any mental health, substance abuse, or emotional treatment or hospitalization since the guardianship in 2017. The district court found Nathan's testimony to be credible. We adopt the district court's credibility finding.

In summary: Following our de novo review, we conclude that Nathan has satisfactorily met the requirement of submitting available mental health and criminal records, "if any." Iowa Code § 724.31(3)(*b*). We also conclude that, when viewed in proper context, those records support the district court's grant of relief.

We have considered the State's concern that Nathan offered no records from mental health providers for the eight-year period between his 2016 troubles and the January 2024 relief hearing. "That alone," the State says, "means that [Nathan] failed, as a matter of law, to meet one of the four evidentiary burdens required by law to restore his firearms rights."

We disagree. An applicant's burden to produce mental health records is imposed by Iowa Code section 724.31(3)(*b*). This section requires the district

court to consider the "petitioner's record, which shall include, at a minimum, the petitioner's mental health records and criminal history records, *if any*." *Id.* (emphasis added). We think this wording—particularly "if any"—reflects the commonsense view that there may well be periods of time for which no records exist. *Id.* After all, if the applicant hasn't had criminal problems, there won't be any criminal records. Likewise, if the applicant hasn't had mental health problems, they may not have sought mental healthcare, and therefore there may be no care records. In this case, Nathan reported to HHS and then testified in court that he had no mental health issues during the eight-year period at issue, and therefore he received no mental healthcare that might have generated additional records. Based on the totality of the record, including firsthand demeanor observations, the district court found Nathan to be credible. We adopt that credibility determination. So we have no concern regarding the absence of additional records following 2016.

Two caveats should be added. First, as our comments above suggest, there will often be *a credibility question* when a petitioner who has a history of serious mental health issues represents to the court that they've experienced no recent mental health problems, and therefore there are no recent mental health records. In this case, the district court resolved that credibility question in Nathan's favor. But if the court had not believed his explanation, the court may well have been justified in concluding that Nathan had not met his burden of proving that substantially all of his mental health records were before the court. Likewise, if the court had not believed Nathan's explanation, the court might well have found that Nathan did not meet his burden of proving "by a preponderance of the evidence that the petitioner will not be likely to act in a manner dangerous to the public safety." Iowa Code § 724.31(4).

Second, and along similar lines, although some states' statutes require a recent mental health evaluation, Iowa's statute does not.[2] So, as the district court recognized, there is no *categorical* requirement that every petitioner seek out such an evaluation. With that said, a recent mental health evaluation may well assist a court when determining whether a petitioner has met her burden. Indeed, in some cases, a district court—or an appellate court—could conclude that a recent mental health evaluation is necessary because of the applicant's particular circumstances. *See, e.g., N.S.,* 13 N.W.3d at 824; *A.M.,* 908 N.W.2d at 285. Here, though, we agree with the district court that a recent mental health evaluation was not necessary in light of the record as a whole, including especially Nathan's credible testimony.

3. *Reputation.* Next we consider paragraph *c,* which directs us to consider Nathan's evidence of reputation. Nathan submitted two letters of support, one from his roommate and one from Jeff, his guardian. Both letters praised Nathan's accountability, kindness, integrity, and work ethic despite Nathan's troubled childhood home life. Jeff's letter summarized the situation this way: "I would trust [Nathan] with my life and my family's lives, that is how confident I am in his character and moral views. He is an example that no one

---

[2]*See, e.g.,* Haw. Rev. Stat. Ann. § 134-6.5(b)(4) (West 2024) ("[T]he court shall consider . . . medical documentation that the petitioner is no longer adversely affected by the condition that resulted in the petitioner's adjudication or commitment . . . ."); Ind. Code Ann. § 33-23-15-2(b)(4) (West 2024) ("[T]he court or department of correction shall consider . . . [a] recent mental health evaluation . . . ."); Md. Code Ann., Pub. Safety § 5-133.3(d)(3) (West 2024) (recent mental health evaluation must be included in the application for relief); N.Y. Mental Hyg. Law § 13.09(g)(2) (McKinney 2024) ("The commissioner shall promulgate regulations to establish the relief from disabilities program, which shall include . . . provisions providing for . . . the authority for the agency to require that the petitioner undergo a clinical evaluation and risk assessment . . . ."); S.C. Code Ann. § 23-31-1030(E)(2)(d) (2024) ("[T]he court shall . . . receive and consider evidence concerning . . . a current [mental health] evaluation presented by the petitioner . . . ."); Utah Code Ann. § 76-10-532(2)(c) (West 2024) (recent mental health evaluation must be included in the application for relief); W. Va. Code Ann, § 61-7A-5(b)(3) (West 2024) (recent mental health evaluation must be included in the application for relief).

should be judged by what happened when they were children." Following our de novo review, we conclude that the letters support the district court's grant of relief to Nathan.

We have considered the State's concern that although the letters were admitted without objection, they are entitled to little weight because they weren't notarized and their authors did not appear at the hearing. Of course we acknowledge that those additional steps could have added to the letters' evidentiary value. Even so, following our careful study of the letters, we think they are entitled to weight. They strike us as authentic statements by thoughtful individuals who know Nathan well, who are familiar with his troubled past, and who are sincerely convinced that Nathan has overcome the issues that led to his disqualification. Moreover, each letter includes the name and contact information of the author, and each letter was provided to HHS prior to the hearing. If HHS had wanted to subpoena the authors for the hearing, it could have. (This isn't to say that HHS was required to subpoena them. It wasn't. But it had the opportunity.)

4. *Changes in circumstances.* Finally, paragraph *d* directs us to consider any changes in Nathan's circumstances since the disqualifying commitment. Like the district court, we think this is the most important consideration in this case. These district court findings summarize the situation well, and we adopt them:

> [Nathan] has had more than six years without the need for mental health intervention either by way of voluntary participation or involuntary participation. He has also gone that long without the need for medication to assist him with mental or emotional challenges. [Nathan] appears to have been caught as a teenager in the middle of the breakup of his parents that very likely had a significant impact on his behavior at the time. It is not surprising to the Court that he acted out as a result and needed some form of intervention. Thankfully, he had an apparent pair of guardian

angels with [Jeff] and [Rose]. They appear to have provided the stability [Nathan] needed, helped him get grounded, and got him on the right path at a difficult time in his life.

Nathan has continued on the right path. He finished high school. He completed a college degree. He lacks any Iowa criminal history. Nathan lives with a roommate and holds a full-time job. His candor and respectfulness earned the district court's praise during the January 2024 hearing. All of this supports the court's decision to grant relief.

**IV. Disposition.**

We deny Nathan's motion to dismiss the State's appeal. Iowa Rule of Appellate Procedure 6.103(1) provides the state with a right to appeal. Iowa Code section 724.31(4) does not strip away that right.

Turning to the merits: Following our de novo review, we conclude that Nathan has provided an adequate record and has proven by a "preponderance of the evidence that the petitioner will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." Iowa Code § 724.31(4). We therefore affirm the district court's grant of Nathan's petition.[3,4]

**Affirmed.**

---

[3]In the interest of clarity, we again note that "Nathan" is a pseudonym. The petitioner's true name is reflected in the district court's record, which is confidential.

[4]Because we find in Nathan's favor for the reasons explained, we do not reach additional questions raised in Nathan's brief, e.g., whether a chapter 125 proceeding can serve as a basis for a federal firearms disability and whether a dismissed commitment proceeding can serve as the basis for a federal firearms disability.